**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lawrence M. LILLY and Joyce Lilly, Defendants–Appellants.**

**Nos. 93–2353, 93–2354.**

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1994.

Decided Oct. 6, 1994.

---

Mark D. Stuaan, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Indianapolis, IN, for plaintiff-appellee.

Mark Toscano (argued), Qualkinbush & Dazey and Annette Fancher Sheldon, and Christopher C. Zoeller (argued), Zoeller & Zoeller, Indianapolis, IN, for defendants-appellants.

Before CUDAHY, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The Reverend Lawrence M. Lilly and his wife, Joyce D. Lilly, were tried on a sixteen count indictment. The first twelve counts charged Pastor Lilly with securities fraud, 15 U.S.C. §§ 77q(a) & 77x. The last four counts charged both Pastor and Mrs. Lilly with income tax evasion, 26 U.S.C. § 7201.

A jury found Pastor and Mrs. Lilly guilty of all sixteen counts as charged in the indictment. Pastor Lilly was sentenced to 66 months imprisonment; Mrs. Lilly received 21 months imprisonment. Both appeal their convictions. Pastor Lilly also appeals his sentence.

## BACKGROUND

In 1975, Pastor Lilly became the pastor of the Faith Baptist Church of Avon, Indiana. The Faith Baptist Church was "independent," meaning that it answered only to its pastor and its elected Board of Deacons. Joyce Lilly worked for several years as a secretary for the Church. Pastor and Mrs. Lilly were both paid a modest salary for their services. Pastor Lilly received additional compensation in the form of allowances for books, automobile expenses, and the like. Finally, the Pastor received a parsonage from the church, in which he and his family were to reside.

In the early 1980's, the Church began selling to investors what it called "Certificates of Deposit." The indictment alleges that Pastor Lilly made "false and fraudulent representations and material omissions" in the sale of these certificates and that he "thereafter converted approximately $900,000 of [certificate] funds to the personal benefit of himself and family members."

The Pastor's role in the Certificates of Deposit scheme was as follows. Lawrence Lilly told potential purchasers that the Certificates of Deposit would be used to finance the improvement or expansion of the Church and to build a retirement complex. He represented or caused others to represent that the Church would pay certificate holders between 12 and 16 percent interest on a quarterly basis and that interest payments would continue until the maturity of the certificate (5 years after the date of issuance). He further promised that, when the certificate matured, the investor would be entitled to repayment of the principal plus the balance of any outstanding interest. Pastor Lilly told investors that they would not have to

pay income taxes on the interest payments they received from the Church and that the investment was safe because it was backed by the assets of the Church. At no time did the Pastor tell investors that the money from the sale of certificates was to be used for the personal expenses of the Lilly family.

By 1989, the Church had raised over $1.6 million dollars from the sale of the certificates to 90 investors, 27 of whom were Church members. The bulk of the certificate money was deposited in what was known as the "Bus Ministry" bank account, over which Pastor Lilly had sole signature authority. Approximately $121,500 was deposited in the Church's "General Fund" account, an account into which regular church offerings were also deposited. A remaining $64,000 of the sales proceeds were deposited into the "Faith Baptist CD" checking account, which the Church used to make interest payments to certificate holders. Pastor Lilly directed church personnel to transfer $1,200 from the General Fund account to the Faith Baptist CD account on a weekly basis, so that there would be sufficient funds to make the interest payments.

The Pastor then took a significant portion of the certificate proceeds, mostly drawn from the unmonitored Bus Ministry account, for his personal use. For example, in 1983, without the Church board's knowledge, Pastor Lilly purchased in the Church's name four airplanes, ranging in price from $150,000 to $380,000. In 1986, he spent $59,000 to buy a house for his mother in Maryland. In 1989, he made a $25,000 down payment on a house for his daughter. Throughout the mid to late 1980's, the Pastor used certificate money to purchase various sports cars and passenger trucks for himself and his family.

In addition to spending certificate proceeds on personal items, Pastor and Mrs. Lilly also underreported their income on the joint federal income tax returns they filed for the years 1986 to 1989. Pastor and Mrs. Lilly primarily reported the Pastor's salary;

however, they failed to report much (if not all) of the salary Mrs. Lilly received from the Church. All in all, the record shows that the defendants underreported their income by $443,747 and owed the government $100,460 in additional taxes.

Lawrence Lilly resigned as pastor of the Church in November of 1989. The Church went into bankruptcy in 1990. As of November 1992, the Church still owed $1.3 million to the purchasers of the Certificates of Deposit.

## ANALYSIS

### Lawrence Lilly

Pastor Lilly makes two arguments on appeal. First, he claims that his conviction must be reversed because the government's investigation and prosecution of him violated his First Amendment right to the free exercise of religion. Second, he complains that the district court erred in computing his sentence · under the Sentencing Guidelines when it imposed a two-level upward adjustment for abuse of a position of trust under U.S.S.G. § 3B1.3 (Nov. 1992).

### a. First Amendment

We first address Pastor Lilly's constitutional challenge. We begin by observing that Pastor Lilly did not raise his First Amendment challenge in the district court. An issue raised for the first time on appeal is considered forfeited,[1] and we will review it only for plain error. Although "[e]rrors of constitutional dimension ... are more freely noticed than are less serious, non-constitutional errors," see *United States v. Shue,* 766 F.2d 1122, 1132 (7th Cir.1985), we will reverse a judgment for plain error only to avert an actual miscarriage of justice. *United States v. Wagner,* 996 F.2d 906, 916 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 720, 126 L.Ed.2d 685 (1994).

---

1. The Supreme Court has recently eschewed the use of the term "waiver" to describe a party's failure to preserve an alleged error for appellate review because that party neglected to timely object to the error in the district court. *See United States v. Olano,* — U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). The court emphasized that "[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' " *Id.* (citations omitted).

In this case, Pastor Lilly's First Amendment challenge does not constitute plain error because it constitutes no error at all. For clarity, we stress that Pastor Lilly does not maintain that the tenets of his religion require him to undertake securities fraud and that by outlawing securities fraud, the statutory provisions at 15 U.S.C. §§ 77q(a) and 77x impermissibly burden his First Amendment right to practice his religion freely. Instead, he asserts that "[t]he ability to determine what is an appropriate use of church money is at the heart of the charges brought against" him, and that "[a]llowing the Court, or a branch of the United States Government, to make that determination violated Pastor Lilly's constitutionally protected free exercise of religion."

In support of his argument, Pastor Lilly refers us to *Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) and *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), for the proposition that the First Amendment guarantees him the right to determine the appropriate use of church money without government interference. Both *Maryland & Virginia Eldership* and *Milivojevich* were civil suits in which the plaintiff sought judicial review of decisions made by ecclesiastical bodies. In *Maryland & Virginia Eldership*, the Court was called upon to resolve a dispute between the General Eldership and two secessionist congregations regarding which faction should control church property and corporations. Similarly, in *Milivojevich*, a defrocked bishop of the Serbian Orthodox Church sued to enjoin the Church from interfering with Diocesan assets and to have himself reinstated as the true Diocesan Bishop. The Supreme Court remarked in *Milivojevich* that "where resolution of [church] disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal ... but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity

before them." 426 U.S. at 709, 96 S.Ct. at 2380.

Without a doubt, neither of the cases the Pastor cites has any application to this case. First and most obviously, this is a criminal case, not a civil one. *Maryland & Virginia Eldership* and *Milivojevich* by their terms apply only to adjudications of civil disputes.

■ Moreover, even in this criminal context, neither the district court nor we are asked to resolve any property dispute or overturn any church decision. The district court's determination of the Pastor's guilt had absolutely nothing to do with reviewing the church's internal allocation of funds, nor did it implicate any issue of religious polity. Instead, Pastor Lilly's offense pertained solely to the way in which he procured the "church" funds in the first place. Pastor Lilly obtained the money by, among other things, making fraudulent misrepresentations and omissions of material fact in the sale of the Certificates of Deposit. Those misrepresentations and omissions are objectively demonstrable actions the Pastor undertook as an individual. Pastor Lilly was convicted not because the government or the court decided that the Church had spent its money unwisely, but because Pastor Lilly did not spend the certificate money in the way that he promised the investors he would, and because he lied to the investors about their ability to recover their investment principal upon certificate maturity.

Hence, neither the U.S. Attorney's investigation into the Pastor's conduct, nor the district court's adjudication of his guilt, required any governmental foray into the realm of religious law or any repudiation of an ecclesiastical tribunal's decision. Pastor Lilly's First Amendment challenge to his conviction is without merit.

### b. Abuse of Position of Trust

■ Next, Pastor Lilly urges that the district court erred by increasing his guidelines offense level by two points for abuse of a position of trust. Section 3B1.3 requires the district court to make two findings: (1) the defendant occupied a position of trust, and (2) the defendant abused his position in a

manner that significantly facilitated the commission or concealment of the offense. *United States v. Dorsey*, 27 F.3d 285, 288 (7th Cir.1994) (quoting *United States v. Boyle*, 10 F.3d 485, 488 (7th Cir.1993)). Application Note 1 to section 3B1.3 states, "The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller."

Pastor Lilly first contends that he was, to investors who were not members of his church, in the same position as any other head of a charitable or religious organization. Thus, he concludes, he did not occupy a position of trust with respect to them, for he was merely provided an opportunity that could as easily have been afforded to many other people.

Second, the Pastor claims that any abuse of a position of trust that he may have committed was adequately considered when the district court increased his offense level by two levels under guideline section 2F1.1(b)(3)(A). Section 3B1.3 states that the abuse of discretion adjustment "may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." Section 2F1.1(b)(3)(A) is a specific offense characteristic which directs the district court to increase a defendant's score by two levels "[i]f the [fraud or deceit] offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization...." Pastor Lilly complains that to increase his score under both sections 2F1.1(b)(3)(A) and 3B1.3 would constitute double-counting.

Pastor Lilly is wrong on both points. First, the district court found that regardless of the position Pastor Lilly held with respect to the non-Church member investors, the Pastor undoubtedly held a position of trust within the Church which enabled him both to commit his crime and conceal it from Church officials and other members of his congregation.

We have held that, "as a general matter, a position of trust is characterized by 'access or authority over valuable things.'" *Dorsey*, 27 F.3d at 289 (quoting *Boyle*, 10 F.3d at 489; *United States v. Lamb*, 6 F.3d 415, 421 (7th Cir.1993)). Pastor Lilly certainly had access or authority over all of the Church's bank accounts. He had sole authority over the Bus Ministry account and directed church personnel to transfer funds from the General Fund account to the Faith Baptist CD account. The Pastor also had authority over another valuable thing: he was entrusted with the direction and financial stability of the Faith Baptist Church.

■ Because Pastor Lilly was the Church's financial decisionmaker, church-member investors and church personnel trusted him to be the sole, unsupervised manager of the Church's finances. This position of trust allowed the Pastor to control the Church's bank accounts and misapply the certificate funds clandestinely. Because Pastor Lilly was the Church's pastor and spiritual leader, his congregation undoubtedly trusted him to further the Church's religious mission. Pastor Lilly's position of trust allowed him to use his authority to mislead church-member investors into believing that the Church needed the certificate funds for building projects and to persuade them to invest their money for the good of the Church and its endeavors. The district court therefore correctly determined that Pastor Lilly occupied and abused a position of trust.

■ Next, the district court did not err in granting the two level upward adjustment for abuse of a position of trust together with the two level increase under section 2F1.1(b)(3)(A), because the two increases reflect two different aspects of Pastor Lilly's offense behavior. As the district court aptly stated, the Pastor

> used his position ... to effect the concealment [of the crime], for the five years or so that it was concealed, by basically taking charge of the financial record keeping and financial activities of the church and used his role as the head of that church to secure the submission of the otherwise responsible officials, trustees and deacons and so forth, who capitulated, basically to

Mr. Lilly, and allowed him to assume this responsibility when he basically asked to or solicited the opportunity. So it's my judgment that the two-level increase is warranted because the full scope of the defendant's behavior is not captured by the wording of the section under the guideline ... 2F1.1(b)(3)(A).

Pastor Lilly, in addition to misrepresenting to all the investors that he was acting on behalf of a charitable or religious organization, also used his position of trust as pastor and financial head of that organization to facilitate the commission and concealment of his crime. We therefore conclude that a two-level adjustment for abuse of a position of trust was warranted in Pastor Lilly's case.

*Joyce Lilly*

Mrs. Lilly advances three arguments on appeal challenging her conviction for income tax evasion. First, she claims that the district court improperly excluded the testimony of an expert witness she proposed to call at trial. Second, she alleges that the jury instructions the district court gave were insufficient to ensure that the jury would determine her guilt separately from the guilt of her husband. Last, she argues that the jury was improperly instructed on the element of willfulness in her offense.

a. Exclusion of Expert

After a proffer of evidence, the district court excluded the testimony of Mrs. Lilly's expert witness, Wanda Dixon. The court excluded Mrs. Dixon's testimony on two grounds. First, the court determined that under Fed.R.Evid. 401, Mrs. Dixon's proposed testimony about the general duties of Baptist ministers' wives was irrelevant to the issue of whether Mrs. Lilly willfully evaded income tax payments. Along similar lines, the court held in the alternative that Mrs. Dixon was not a proper expert witness under Fed.R.Evid. 702, because her specialized knowledge would not assist the trier of fact in determining a fact in issue.

■ Trial courts have broad discretion over the decision to admit or exclude expert testimony, and we review such rulings only for abuse of discretion. *United States v.*

*Larkin,* 978 F.2d 964, 971 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *see also United States v. Tipton,* 964 F.2d 650, 653 (7th Cir.1992) (stating that such determinations "will be affirmed unless ... manifestly erroneous").

Mrs. Lilly maintains that Mrs. Dixon's expert testimony would have been relevant to negate evidence of her intent to commit tax evasion and to "help show her good faith." However, during the proffer of evidence before the district judge, Mrs. Dixon stated that she had no knowledge of whether the duties of a minister's wife would preclude the filing of a complete and accurate tax return:

Prosecutor: Have you found in your experience that your duties of a wife of an independent Baptist minister conflicts with your duty as a citizen to file a truthful federal tax return?

Dixon: The only way I know how to answer is that my husband takes care of all that. I know nothing about it.

Prosecutor: Is it fair to say that you've carried out your duties as the wife of an independent Baptist minister while having your tax returns filed?

Dixon: I don't know about the tax returns. Like I said, he handled that. I don't know about it. I don't work, so I don't file any personally.

Furthermore, Mrs. Lilly did not argue to the district court, as she does to this court, that Mrs. Dixon's testimony tended to negate evidence of her intent to evade tax. Before the judge's ruling, Mrs. Lilly's attorney merely explained that Mrs. Dixon's testimony was relevant to the case because it would show that Mrs. Lilly believed in good faith that the Church had authorized all of her personal expenditures and that, for all her hard work, she reasonably believed that she was entitled to the compensation she received.

■ Mrs. Lilly's good faith belief that she was entitled to the certificate money is irrelevant to whether she willfully failed to report her income on her federal tax returns. Mrs. Dixon's expertise on the general duties of ministers' wives, without specific reference to whether those duties would render a min-

ister's wife incapable of willingly evading tax, could not have aided a jury in determining the issue of Mrs. Lilly's intent. Accordingly, the district court's decision to exclude Mrs. Dixon's testimony was proper.

### b. Jury Instructions

■ Mrs. Lilly's remaining contentions regarding the deficiency of the district court's jury instructions merit only brief discussion. Mrs. Lilly admits that she did not object to the jury instructions at issue in the district court; however, she asks us to review them for plain error. As we have already stated, we will reverse a case for plain error only to avert an actual miscarriage of justice.

■ Mrs. Lilly first alleges that Jury Instruction No. 9 instructed "the jury to join Pastor and Mrs. Lilly together under the undifferentiated term 'a defendant.'" Instruction No. 9 read:

Although the defendants are being tried together, you must consider the · case against each separately. In doing so you must decide what the evidence shows about each defendant, without considering any evidence that may have been received solely against the other defendants. Each defendant is entitled to have the case against him or her decided solely on the evidence and the law which applied to the defendant.

When I refer in these instructions to "a defendant" or "the defendant" in the singular, I am stating the law applicable to each of the defendants individually.

Mrs. Lilly argues that, "in the very instruction designed to ensure the jury would keep separate the evidence presented against Pastor and Mrs. Lilly, the jury is instructed to think of Pastor and Mrs. Lilly as one person." Similarly, Mrs. Lilly claims that the district court's instructions to the jury on how to use the verdict forms referred only to the "verdict," rather than to the "verdicts," thereby leading the jury to think of the two defendants as one.

We believe that Mrs. Lilly is grasping for straws. Both Jury Instruction No. 9 and the verdict forms are manifestly clear as to the distinctness of Pastor Lilly's and Mrs. Lilly's

cases. Indeed, in Instruction No. 9, both references to a "defendant" in the singular were made for the sole purpose of clarifying that the jury was to consider the fate of the two defendants separately. The jury was also given two separate sets of verdict forms—one naming Lawrence Lilly only and the other naming Joyce Lilly only. Hence, neither the wording of the jury instruction nor the wording of the verdict form constitutes plain error.

■ Finally, Mrs. Lilly argues that the district court improperly instructed the jury on the issue of whether she willfully committed tax evasion. Specifically, she submits that "[b]y mistake the Court instructs the jury that Mrs. Lilly knew she had a legal duty to pay." The instruction Mrs. Lilly challenges read as follows:

The term "willfully" means voluntarily and intentionally, with the specific intent to keep from paying a tax imposed by the income tax laws, which it was the legal duty of the defendants to pay to the government, and which the defendants knew it was their legal duty to pay.

■ Once again, Mrs. Lilly has based her argument on a tortured reading of the instruction at issue. The wording of the district court's instruction unambiguously instructed the jury that for it to find that Mrs. Lilly acted "willfully," it was required to find (1) that Mrs. Lilly acted voluntarily and intentionally, (2) that Mrs. Lilly acted with the intent to keep from paying a tax, (3) that the tax was imposed by the income tax laws, (4) that Mrs. Lilly had a legal duty to pay the tax to the government, and (5) that Mrs. Lilly knew it was her legal duty to pay. It would require a stretch of the imagination to believe that a jury would have interpreted this instruction to mean that the court was directing a verdict on the issue of Mrs. Lilly's knowledge of her legal duty to pay. Further, "it is not our role to edit for style any jury instructions that accurately state the law and allow for consideration of the defendant's theory of the case." *United States v. Kucik,* 909 F.2d 206, 211 (7th Cir.1990) (citation omitted). We therefore hold that the district court's instruction did not constitute plain error.

## CONCLUSION

For the foregoing reasons, we AFFIRM Lawrence and Joyce Lilly's convictions. Lawrence Lilly's sentence is also AFFIRMED.