[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 10, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-14746

_____

D. C. Docket No. 99-00078-CR-T-25F

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HAYWOOD EUDON HALL,
a.k.a. Don Hall,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 10, 2003)**

Before BLACK and FAY, Circuit Judges, and HUCK[*], District Judge.

FAY, Circuit Judge:

In March 1999, Defendant, Haywood Eudon Hall ("Hall"), was charged in

_____

[*]Honorable Paul C. Huck, United States District Judge for the Southern District of Florida,
sitting by designation.

17 counts of a 20 count indictment along with six co-defendants.[1] The government alleged that Hall and the co-defendants, as principals in Greater Ministries International Church (GMIC), managed and promoted a fraudulent investment scheme. Hall was subsequently convicted of five counts: mail fraud conspiracy, money laundering conspiracy, and three counts of mail fraud. In this appeal he raises various challenges to both his convictions and sentencing. Hall first argues that the district court erred in not requiring the jury to find proof of an overt act to support his conviction for conspiracy to commit money laundering under 18 U.S.C. § 1956(h). Since we find that proof of an overt act is not an essential element under § 1956(h), we affirm Hall's money laundering conspiracy conviction. Hall also claims that the district court erroneously applied a two-level increase to his sentence pursuant to U.S.S.G. § 3B1.3 for abuse of position of trust due to his status as a pastor. We conclude that Hall did not occupy a position of trust under the Sentencing Guidelines, and therefore reverse this sentence

---

[1]Two co-defendants, James R. Chambers and Andrew J. Krishak, accepted plea agreements for their role in the crime. The other four co-defendants, Gerald Payne, Betty Payne, David Whitfield, and Patrick Talbert, were found guilty on all counts charged against them (except that Count Five was dismissed with respect to all defendants on a motion for judgment of acquittal). These four defendants appeal their convictions and sentences on various grounds, and some have also adopted issues raised by co-defendants; however, we find no merit to any of the issues not discussed in this opinion and they do not warrant discussion.

enhancement.[2]

I.

In early 1996, Hall joined GMIC as a director and pastor of the church, and also became head of its World Missions program. When Hall came to GMIC, he became involved in the "gifting" program that had been started by one of the co-defendants, Gerald Payne. Though the name of the program changed from the "Double Your Money Program," to the "Double Your Blessings Program," and finally to the "Faith Promises Program," the gifting program remained essentially the same throughout its life. Under the program, investors would "gift" money to GMIC in increments of $250 and within 17 months the "giftors" were to get back double their money in the form of "giftbacks."

Hall and some of the other defendants held "roadshow" meetings across the country to promote the program. Despite using religious rhetoric to encourage participation in the program, the main focus of the meetings was on how much money could be made. Although there were disclaimers on the "gifting forms" stating that there were no guarantees of a return, the defendants expressly or impliedly promised giftbacks. The defendants told the giftors that profits were

---

[2]We are aware that Hall argues the government failed to present sufficient evidence to support any of his convictions and that he has also adopted issues raised by co-defendants; however, we find no merit in any of these issues and they do not warrant discussion.

generated through investments in mining for precious metals and gems, in offshore commodities and drilling, and in overseas banks that paid high interest rates. Aside from being led to believe that they would get back double their money, potential investors were also told that some of the profits generated would go to feed the homeless, rehabilitate drug addicts, and support missionaries.

However, GMIC never had any of the assets the defendants claimed to be investing in. There is no record of GMIC or any one of the defendants having gold, silver, or diamond mines in the United States from 1978 to the present. In addition, the diamond and gold mines GMIC was supposed to be operating in Liberia never did fully get off the ground. Although a diamond mine there produced tiny industrial grade diamonds of little value, the gold mines were never even operational. GMIC, however, did buy gold and silver and then had a company mint gold and silver medallions with the GMIC logo on them in order to promote the gifting program to potential giftors and to appease already dissatisfied investors.

Furthermore, the GMIC office supposedly located in the Cayman Islands never existed. Similarly, the Greater International Bank of Nauru was merely a storefront inside GMIC's Tampa building. No money was ever deposited into the Bank of Nauru, as giftbacks were deposited purely on paper by the giftors through

4

couriers. Giftors were encouraged to make their gifts through these courier services, and this made it especially easy for already participating investors to "re-gift" their giftbacks, or deposit them in this "offshore bank," without ever seeing the cash, thus allowing the defendants to perpetrate their fraud. If a giftor, however, still wanted to withdraw money from his account, the bank representative, a GMIC gospel singer, would have to go directly to Defendant Payne to get money or gold.

Notwithstanding the defendants' promises of large amounts of money, many investors received little or no return on their gifts. When giftors inquired about their money, the defendants employed stalling techniques. Moreover, despite the defendants' claims that giftors' investments were going to charity, only about one percent of this money went to charitable purposes. In contrast, each director received monthly "gas money," which was a five percent commission of all money gifted or re-gifted by an investor recruited by that director. All gas money was paid in cash by Defendant Payne, and over the course of the fraud, Hall received more than $539,000 of this money.

## II.

Hall first claims that the district court erred in refusing to instruct the jury that proof of an overt act was necessary to convict him under 18 U.S.C. § 1956(h)

for conspiracy to commit money laundering. Although this Court reviews a refusal to give a requested jury instruction for abuse of discretion, *United States v. Condon*, 132 F.3d 653, 656 (11th Cir. 1998), if the refusal was based on an error of law, then it is by definition an abuse of discretion. *United States v. Govan*, 293 F.3d 1248, 1250 (11th Cir. 2002). While neither this Court nor the Supreme Court has determined whether commission of an overt act is an essential element of a conviction under § 1956(h), other circuits are split on the issue. *See United States v. Godwin*, 272 F.3d 659, 669 n.9 (4th Cir. 2001) (noting that 18 U.S.C. § 1956(h) does not explicitly require proof of an overt act); *United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001) (finding that § 1956(h) does not require the indictment to allege an overt act). *But see United States v. Wilson*, 249 F.3d 366, 379 (5th Cir. 2001) (finding proof of an overt act is required for a conviction under § 1956(h)); *United States v. Hildebrand*, 152 F.3d 756, 762 (8th Cir. 1998) (finding that § 1956(h) requires proof of an overt act for conviction).

Those circuit courts that have found § 1956(h) to require proof of an overt act have relied on case law interpreting the general conspiracy statute of 18 U.S.C. § 371. *See Wilson*, 249 F.3d at 379; *Hildebrand*, 152 F.3d at 762. Section 371 provides:

> If two or more persons conspire either to commit any
> offense against the United States, or to defraud the

> United States, or any agency thereof in any manner or for any purpose, and one or more of such persons **do any act to effect the object of the conspiracy**, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371 (emphasis added). It is important to note that § 371 expressly requires proof of an overt act in furtherance of the conspiracy to establish violation of the statute. However, the money laundering conspiracy statute, 18 U.S.C. § 1956(h), does not contain this express language:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956(h). In this respect, the language of § 1956(h) is not like § 371, but instead is nearly identical to the drug conspiracy statute, 21 U.S.C. § 846. *See Tam*, 240 F.3d at 802; *United States v. Threadgill*, 172 F.3d 357, 366 n.5 (5th Cir. 1999). Section 846 provides:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846. The Supreme Court, recognizing that the language of § 846 does not call for an overt act, refused to infer an overt act requirement into the statute. *United States v. Shabani*, 513 U.S. 10, 13 (1994). In reaching this conclusion, the

7

Supreme Court compared the language of 21 U.S.C. § 846 to that of 18 U.S.C. § 371:

> [W]e find it instructive that the general conspiracy statute, 18 U.S.C. § 371, contains an explicit requirement that a conspirator "do any act to effect the object of the conspiracy." In light of this additional element in the general conspiracy statute, Congress' silence in § 846 speaks volumes.

*Id.* at 14. Since the language of the statute at issue here, 18 U.S.C. § 1956(h), is nearly identical to 21 U.S.C. § 846, we are compelled to follow the Supreme Court's reasoning in *Shabani.* Given the absence of any language in § 1956(h) requiring proof of an overt act, we find that an overt act is not an essential element for conviction of conspiracy to commit money laundering. Accordingly, the jury instructions approved by the district court were indeed proper.

## III.

Hall next contends that the district court erroneously enhanced his sentence under U.S.S.G. § 3B1.3 for abuse of position of trust due to his status as a pastor. Pursuant to the Sentencing Guidelines, this two-level increase is appropriate "[i]f the defendant abused a position of public or private trust, ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In order for the district court to have applied this increase, two elements must have been established: (1) that the defendant occupied a position of public or

private trust; and (2) that the defendant abused that position in a significant way to facilitate the commission or concealment of the offense. *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998). "We review the district court's fact findings for clear error, but its determination whether the facts justify an abuse-of-trust enhancement we review de novo." *United States v. Ward*, 222 F.3d 909, 911 (11th Cir. 2000) (quotation marks and citation omitted). Although we accept the district court's finding of fact with regard to Hall's status as a pastor, we conclude that this fact alone is insufficient to support a determination that Hall occupied a position of trust with respect to the victims.

In finding that Hall's status as a pastor put him in a position of trust, the district court did not indicate whether it found Hall to have occupied a position of public trust or of private trust. Nevertheless, it is of no consequence as to whether we analyze this as a private or public trust, for we find the evidence in the record to be insufficient to support a finding that the relationships, if any, between Hall and the victims were of the type to put Hall in any position of trust under the Sentencing Guidelines. Within the context of fraud, this Court has found a position of trust to exist in two instances: "(1) where the defendant steals from his employer, using his position in the company to facilitate the offense, and (2) where a fiduciary or personal trust relationship exists with other entities, and the

9

defendant takes advantage of the relationship to perpetrate or conceal the offense."

*Garrison*, 133 F.3d at 837-38 (quotations omitted). This case can only fall within the second situation. However, since the government does not allege the existence of a fiduciary relationship, to conclude that Hall occupied a position of trust we must find a "personal trust relationship" between Hall and the victims.

Hall's status as a pastor does not necessarily create a personal trust relationship between himself and the victims.[3] *See United States v. Morris*, 286 F.3d 1291, 1297 (11th Cir. 2002). *See also United States v. Caplinger*, 339 F.3d 226, 236-38 (4th Cir. 2003) (finding that defendant's representation as a physician did not by itself mean he occupied a position of trust). In *Morris*, though the defendant was represented as an attorney to investors in an investment fraud scheme, he was found not to have abused a position of trust. *See id.* at 1296-97. This Court explained:

> [I]t simply is not the case that an attorney holds a
> position of trust with respect to all people with whom he
> comes into contact solely by virtue of his status as an
> attorney. Morris did not have an attorney-client
> relationship with any of the victims. Although Morris'

---

[3]The district court cites the Seventh Circuit case, *United States v. Lilly*, 37 F.3d 1222 (7th Cir. 1994), as being instructive in determining that Hall occupied a position of trust by virtue of his status as a pastor. Although *Lilly* dealt with an investment fraud scheme by a pastor, the *Lilly* court specifically found that "regardless of the position Pastor Lilly held with respect to the non-Church member investors, the Pastor undoubtedly held a position of trust within the Church." *Id.* at 1227. However, since all the victims presented by the government in this case were non-church member investors, the district court's reliance on *Lilly* is misplaced.

> status as an attorney may have been used to develop the trust of the victims, there are no facts to support the conclusion that as an attorney Morris occupied a position of trust in relation to these victims.

*Id.* at 1297. As in *Morris*, the government concedes that there is no evidence in the record indicating that Hall had a pastor-clergy relationship with any of the victims. Although Hall may have used his status as a pastor to develop the trust of investors, this does not demonstrate that Hall created a personal trust relationship with any of the victims. The government claims that evidence of Hall espousing religious rhetoric at the roadshow meetings is sufficient to establish this relationship. However, we must be careful to "distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." *Garrison*, 133 F.3d at 838 (citations omitted). Since Hall and the other elders traveled across the country, these meetings were not regularly held in one locality, and listening to a meeting over the course of a few hours is not enough to establish the type of relationship contemplated by the Sentencing Guidelines. The government attempts to equate Hall's speeches at these meetings with the type of preaching a pastor engages in with members of his church at regular church services. These roadshow meetings, however, were not regular church services, and the government concedes that there

11

is no evidence in the record to indicate Hall preached about the gifting program to victims at regular church services where he presided as a pastor.

Most importantly, in determining whether Hall occupied a position of trust, we must focus on the relationship between Hall and the victims from the perspective of the victims. *Garrison*, 133 F.3d at 837. Thus, Hall's status as a pastor and his involvement in the roadshows are only as significant as the victims indicate. It was the government's burden during sentencing, to show, by a preponderance of the evidence, that Hall occupied a position of trust with respect to his victims. *See United States v. Kummer*, 89 F.3d 1536, 1545 (11th Cir. 1996). However, instead of presenting any evidence to indicate that there was in fact a personal trust relationship between Hall and even one victim, the government relied solely on Hall's status as a pastor. During trial, the government called multiple victims as witnesses. None of these victims came to the roadshows for spiritual guidance; rather, all of them testified that they came to invest money, not because Hall was a pastor, but because they wanted to "double their money." The government did not even present evidence that Hall spoke of the gifting program to church members during regular church services, much less evidence that even one church member was a victim of his fraud. Now the government asks this Court to assume that at least one of the victims was a member of Hall's church and

12

considered Hall to be his pastor. We decline to assume facts that the government had ample opportunity to establish during either trial or sentencing. When these victims decided to invest their money, they trusted that this was a legitimate investment program as represented by the directors, including Hall; however, this relationship between Hall and his victims is no different than the relationship that exists in every successful fraud. *See id.* at 838. With respect to the victims that the government presented, there was no personal trust relationship with Hall so as to place him in a position of trust under the Sentencing Guidelines, and therefore the two-level enhancement under U.S.S.G. § 3B1.3 was in error. We are therefore obliged to vacate the sentence imposed and remand for resentencing.

**AFFIRMED in part; REVERSED in part; Sentence Vacated and remanded for resentencing.**