In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-2392

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES L. SLOAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 05 CR 18—**Sarah Evans Barker**, *Judge.*

ARGUED DECEMBER 8, 2006—DECIDED JULY 9, 2007

Before BAUER, FLAUM, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted James L. Sloan of six counts of mail fraud and 26 counts of wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. The district court sentenced Sloan to 18 months of incarceration, followed by two years of supervised release, and ordered him to pay $19,654.60 in restitution. Sloan now appeals his judgment of conviction and sentence. We affirm.

## I. Background

With an offer of "Free Electricity for Life! Plus—the opportunity to make $492,000.00 per year" and other

similar offers, Sloan enticed at least ninety individuals to join his organization, the Christian Freedom Foundation. To take advantage of these offers advertised in the March, April, July, and August 2001 editions of Sloan's Christian Freedom Chronicle, these individuals were required to join the Christian Freedom Foundation.

A new member would join the Christian Freedom Foundation by sending his or her application and payment of $498.75, or up to four multiples thereof, to a post office box located in New Trenton, Indiana, of which Sloan was the signatory, or to a fax number subscribed to Sloan at his residence. A new member also could join the organization by submitting an application and a check for $49.95, one month's payment, which would allow Sloan to withdraw membership fees on a monthly basis from that person's bank account.

Unfortunately, the offers of free electricity and the chance to make hundreds of thousands of dollars were too good to be true; none of the new members of the Christian Freedom Foundation received free electricity or any payments in excess of what they had paid to the organization.

Sloan operated the Christian Freedom Foundation from his home in Lawrenceburg, Indiana. He ran a different enterprise, Christian Singles International, from an office in Cincinnati, Ohio. Christian Singles International published "Christian Singles News and Contacts," which was included as an insert in each issue of the Christian Freedom Chronicle and of which Sloan was the editor.

### A. The March 2001 Advertisement

The advertisement on the back page of the March 2001 issue of the Christian Freedom Chronicle stated that by joining the Christian Freedom Foundation at a cost of

$498.75 per year, new members would receive a subscription to the Christian Freedom Chronicle, a Free Electricity Certificate, and the opportunity to participate in the Christian Freedom Foundation's "network marketing program." It specified that the new member would receive "a Free Electricity Certificate issued by the United Community Services Association (UCSA) in conjunction with the International Tesla Electric Company (ITEC)." The new member also would have use of a 26,000 kilowatt per year generator, when such units became available, that would be set up on his or her property at no additional cost. According to the advertisement, there was a waiting list for these units and "[f]irst come, first served."

The advertisement also described the network marketing program. New members of the Christian Freedom Foundation would be entered into a "3x8 Forced Matrix." When the new member's matrix became full, which would require an additional 9,840 people to join the organization, he or she would receive $40 for each new member of the matrix, totaling $393,600. Even better, the advertisement claimed that members did not have to wait for their matrix to become full before they would receive payments. Additionally, members had the opportunity to earn up to $492,000 per year by bringing just three other people into the Christian Freedom Foundation because he or she would receive $50 for each person in the matrix.

In smaller type, the advertisement stated that the free electricity offer was for residential use and property owners only. Tenants and commercial establishments, however, were eligible to participate in the Christian Freedom Foundation, including the business opportunity.

## B. The April 2001 Advertisement

The April 2001 edition of the Christian Freedom Chronicle ran a similar advertisement on its back page but with

minor adjustments to its offer. In this offer, members of the Christian Freedom Foundation "have a chance" to get free electricity for life and that "[i]f and when" the new member's generator is available, it would be set up on his or her property at no cost.

### C.  The July 2001 and August 2001 Advertisement

The July 2001 and August 2001 editions contained additional, significant changes. Like the April 2001 advertisement, these identical advertisements gave new members of the Christian Freedom Foundation "a chance" to get free electricity for life by paying to join the Christian Freedom Foundation. They also offered the opportunity to make $472,320 per year and contained a photograph of the generator. Rather than merely joining a 3x8 forced matrix, however, new members would be entered twice into a "Double Flip-Flop 3x8 forced matrix." The advertisements stated that new members "will get commissions from the first matrix on the 10th of the month, and from the second one on the 25th of the month. The payments will be $2.00 each for every person who has joined after you—up to five levels (363 positions)—twice a month. That totals $1452.00 per month." The advertisements claimed that new members who recruited additional members would have even greater earning potential. These advertisements also contained a chart that showed how the Double Flip-Flop 3x8 matrix purportedly operated and offered various "quick start bonuses," including a bonus of $15 for each person introduced by the new member to the Christian Freedom Foundation.

These solicitations even asked the attractive question, "Finally, how about if we GUARANTEE your income? Guarantee that you will make at least 20% more than you paid to join CFF? We will!" (Emphasis in original.) Readers

were asked to call a telephone number for an explanation as to how the guarantee works.

In a smaller typeface, the advertisements hedged on the guarantee, stating,

> Caveat on all the numbers in this article: No one knows for sure what anyone else's future earnings will be. The figures in the article and on the chart are projections only of what is possible. What your actual earnings will be is determined by your own efforts and the rest of your team—those people who are above and below you in your matrix, eight levels each way.

In an about-face, the advertisements continued: "Having said that, there WILL BE spillover. It *is* a forced matrix. You benefit from everyone else in your matrix—above and below you." They directed the readers to rush to submit their applications to the Christian Freedom Foundation by exclaiming, "First come; first served!" Because applications were time and date stamped, the advertisements explained, two applications received ten minutes apart could mean that the first person would make money sooner than the second person as a result of their different placements in the Double Flip-Flop 3x8 forced matrix.

### D.  Sloan's Use of the Mails and Wires

In December of 1993, Sloan hired Marcia Harting at Christian Singles International. Harting assisted Sloan in preparing the materials that were mailed out to the new members of the Christian Freedom Foundation regarding the free-electricity generator. These materials consisted of two letters, "Dear Free Electricity Applicant" and "Letter of Confirmation," as well as a document entitled "Registration For A Free Electricity Generator on a Residence." Each of these documents was pre-printed. Harting com-

pleted each of these forms with information that Sloan gave to her. At Sloan's direction, she also stamped the name "Emily Stewart" on the registration forms on the line for the dealer; however, no one named "Emily Stewart" worked with Harting at Christian Singles International. Once completed, the documents were mailed to the named individuals.

The advertisements in the Christian Freedom Chronicle directed individuals interested in additional information to call a telephone number subscribed to Sloan at his residence or a telephone number subscribed to and located at the office of Christian Singles International.

Between March 1, 2001 and September 30, 2001, the checks and money orders sent by new members to the Christian Freedom Foundation were transmitted by wire communications in interstate commerce to an account held in the name of Christian Singles International. Sloan was the signatory on the account. The payments sent to new members from the Christian Freedom Foundation were drawn from a bank account of the Christian Freedom Foundation. Again, Sloan was the signatory on the account.

## E.  District Court Proceedings

On May 25, 2005, a federal grand jury returned an indictment that charged Sloan with six counts of mail fraud and 26 counts of wire fraud. During the course of the trial, eight witnesses testified to being victims of Sloan's advertisements: Donald Cobb, John Scholl, Frieda Challender, Renard Carpenter, Jody Smith, Theresa Lynn Jordan, Linda Wantland, and JoAnn Bemiller. Steve Cannon also testified that he joined and solicited others to join the Christian Freedom Foundation. Each of these witnesses joined the Christian Freedom Foundation after

seeing the advertisements for the generator that would produce free electricity and the opportunity to make money. Each witness submitted an application and payment. Cobb, Scholl, Challender, Carpenter, Smith, Jordan, Wantland, and Bemiller testified that they never received the generator but did receive documents pertaining to the generator, including the registration.

Each witness also received less money in payments from the Christian Freedom Foundation than they had paid as members: Cobb received eight checks, totaling approximately $148, but paid $349.75; Scholl received seven checks, totaling approximately $148, but paid $249.75; Challender received eight checks, totaling approximately $164, but paid $747.75; Carpenter received four checks, totaling approximately $96, but paid $498.75; Smith received two checks, totaling approximately $40, but paid $190; Jordan received nine checks, totaling approximately $207, but paid $649; Wantland received ten checks, totaling approximately $275, but paid $400; and Bemiller received six checks, totaling approximately $136, but paid $498.75. These victims also testified that they would not have paid to join the Christian Freedom Foundation had they known that they would not receive the generator or would receive less money in matrix payments than they had paid to the organization.

Cobb, Scholl, and Wantland also testified that they had spoken with Sloan by telephone regarding the generators. Bemiller testified that she had telephoned the Christian Freedom Foundation on several occasions and left messages with the woman who answered the telephone but never received a return call from Sloan.

The jury found Sloan guilty on all counts in the indictment. The district court held a sentencing hearing on April 21, 2006. Over Sloan's objections, the district court accepted the recommendations of the presentence investiga-

tion report ("PSR"). The PSR's recommendations included a three-level increase in Sloan's offense level pursuant to USSG § 2F1.1(b)(1)(D) because the loss was between $10,000 and $20,000; an additional three-level increase in the offense level pursuant to USSG § 2F1.1(b)(4)(A) because the offense involved a misrepresentation that Sloan was acting on behalf of a religious organization; a two-level increase pursuant to §§ 2F1.1(b)(2)(A) and (B) because the offense involved more than minimal planning and a scheme to defraud more than one victim; and a two-level increase pursuant to § 2F1.1(b)(3) because the offense was committed through mass-marketing. Having accepted the recommendations of the PSR, the district court sentenced Sloan to 18 months' incarceration, followed by two years of supervised release, and ordered him to pay $19,654.60 in restitution. Sloan filed a timely notice of appeal on May 12, 2006.

## II.  Analysis

Sloan raises three issues on appeal. He argues that the evidence presented at trial was insufficient to support a conviction for either mail fraud or wire fraud. He also contends that the trial court erred in failing to excuse Juror Propes, thereby denying Sloan his right to an impartial jury. Finally, Sloan asserts that the district court erred in calculating the loss amount and in applying certain enhancements to his sentence. We will address each challenge in turn.

### A.  Sufficiency of Evidence

The first issue that we address is Sloan's challenge to the sufficiency of the evidence in support of his conviction for mail fraud and wire fraud. Our review of a challenge to the sufficiency of the evidence is under a highly deferen-

tial standard. *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005). We review the evidence in the light most favorable to the government. *United States v. Tadros*, 310 F.3d 999, 1005-06 (7th Cir. 2002). We find the evidence insufficient only if no rational trier of fact could have found guilt beyond a reasonable doubt. *Id.* at 1006.

Sloan argues that the evidence was insufficient to establish either the existence of a scheme to defraud or an intent to defraud, both of which are required elements of mail and wire fraud offenses. *See United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006) ("The requisite elements of [mail fraud and wire fraud offenses] . . . are three: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme.") (citations omitted).

### 1. Scheme to Defraud

A scheme to defraud requires "the making of a false statement or material misrepresentation, or the concealment of material fact." *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005) (*quoting Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003)). This concept includes both statements that the defendant knows are false and "half truths" that the defendant knows are misleading and on which he expects another to act to his detriment but to the defendant's benefit. *Id.* (*citing Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1346 (7th Cir. 1995)). This Court has held that "a scheme to defraud exists when the conduct at issue has 'demonstrated a departure from the fundamental honesty, moral uprightness and candid dealings in the general life of the community.'" *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004) (*quoting United States v. Hammen*, 977 F.2d 379, 383 (7th Cir.

1992)). Here, there is ample evidence to support the jury's finding of a scheme to defraud.

Sloan constructed each advertisement to focus the reader's attention on the offer of free electricity and the opportunity to earn money. While he used some cautionary language in the advertisements, such as the "chance to get free electricity for life," "if and when your unit is available," and "[n]o one knows for sure what anyone's future earnings will be," implicit in the advertisements was the existence of a 3x8 forced matrix, a double flip-flop 3x8 forced matrix, and machines that provided free electricity, *e.g.,* "when your unit is available." Sloan even made explicit the implicit existence of the generators by showing photographs of a machine in the July and August advertisements. Not only were there no generators, there were no matrices, whatever those were supposed to be.[1] Moreover, the June and August advertisements "guaranteed" members that they would receive a return of 20% more than they paid to join the Christian Freedom Foundation. Yet none of the witnesses who testified at trial even earned back the amount that they had paid to join the organization.

Sloan also created a false sense of urgency with these advertisements, claiming that there was a waiting list for the generators and that they would be distributed on a "first come, first served" basis. Additionally, the matrices purportedly operated in such a way as to make an early application more beneficial than a later one.

In addition to the half truths[2] and fictions contained in the advertisements, the documents sent to the new

---

[1] During oral argument, neither party was able to explain the 3x8 forced matrix or double flip-flop 3x8 forced matrix.

[2] There is a Yiddish proverb that defines a half-truth as a whole lie.

members of the Christian Freedom Foundation by Sloan misrepresented that "Emily Stewart" was the dealer of the free-electricity machine, directing all questions about the equipment or future dates of installation to this fictional person.

A jury could conclude easily based on these facts that Sloan's solicitations to join the Christian Freedom Foundation were dishonest, that they were made with the intention of inducing people to join the organization, and that they influenced people to join the Christian Freedom Foundation to their detriment and Sloan's benefit. The jury's finding of a scheme to defraud was therefore rational and supported by the evidence.

### 2. Intent to Defraud

To show an intent to defraud, we require a "willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Leahy*, 464 F.3d at 786 (*quoting United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)). Direct evidence of an intent to defraud is rare; a specific intent to defraud may be shown, however, by circumstantial evidence and inferences drawn from the scheme itself that show that the scheme was reasonably calculated to deceive individuals of ordinary prudence and comprehension. *Stephens*, 421 F.3d at 509.

Again, there is ample evidence to support the jury's finding. Sloan ran a series of advertisements offering free electricity and the opportunity to make a great deal of money simply by joining his organization. With money paid by new members, he was able to make "matrix" payments to existing members and to retain a portion of the proceeds for himself. Sloan continued the artifice by sending out documents relating to the free-electricity generator.

He had these documents stamped with the name of Emily Stewart. In this way, it was not apparent to his victims that they were being defrauded. Had Sloan intended to operate a legitimate organization offering a legitimate product, he would have affixed his own name to the registration as the dealer of the free-electricity generators. Such evidence was sufficient to permit the jury to find an intent to defraud beyond a reasonable doubt.

## B.  Juror Propes

Sloan also argues that his Sixth Amendment right to an impartial jury was compromised by the continued presence of Juror Ryan Propes on the jury. Before opening statements, Juror Propes had informed the district court's courtroom deputy of his concerns about his ability to remain impartial since, in his mind, the case involved Christianity. Following opening statements and the presentation of some evidence, the district court brought the concerns of Juror Propes to the attention of the parties, outside the presence of the other jurors. Juror Propes informed the district court and the parties that he might have a conflict of interest because of the use of the term "Christian" in the case and his role as a deacon in his church. In response, the district court stated its opinion to Juror Propes that issues of Christianity were tangential to the issues in the case. The district court then asked Juror Propes whether he agreed with its opinion. Juror Propes agreed. Sloan's trial attorney did not object to the colloquy, did not ask that Juror Propes be removed from the jury, and did not move for a mistrial. Our review, therefore, is for plain error only. *See* Fed. R. Crim. P. 52(b); *United States v. Davis*, 15 F.3d 1393, 1407 (7th Cir. 1994).

There is little doubt that the district court's colloquy with Juror Propes was leading: the district court asked

Juror Propes to agree with its own opinion.[3] We recognize that there is a power differential between a United States District Court judge and a juror. Generally, a juror would be hard-pressed to disagree with a premise stated by the district court with which the district court asks the juror to agree. The better practice is for the district court to ask non-leading questions when examining a juror for bias.

---

[3] The colloquy went as follows:

The district court: Hold on just a second and let me say out loud what I was told; that you thought it might—when you got to thinking about it more, you thought it might have been Christian, although we covered it several ways, and you apparently were concerned because you're a deacon in your church, that you might have some conflict of interest or something?

Juror Propes: Yes, I don't know if I just didn't catch it the whole time or exactly what it was, but I have an issue with making money with churches. I'm a member of a church, I'm a faithful member of a church, and I know we have different ways of acquiring money, and it's not through anything like this. I just totally disagree with this.

The district court: All right. You can tell now from having heard both the opening statements and more of the evidence that the issues of the Christian religion are really tangential to this dispute. So I don't foresee any way in which there would be a conflict of interest. And I just wanted to raise that with you and make sure that you were of the same way of thinking, that it shouldn't conflict with your religious beliefs. Do you agree with that?

Juror Propes: Yes.

That being said, Sloan has made no showing that he was denied his right to an impartial jury. There was no indication during the questioning by the district court that Juror Propes had any bias. Juror Propes was selected as a juror because he swore that he could be impartial and base his verdict only on the evidence that was presented. After expressing his concerns and having them assuaged by the district court's explanation, he agreed that there was no conflict. The district court was satisfied by Juror Propes' response, as are we.

## C.  Loss Amount and Sentencing Enhancement

Finally, Sloan raises a series of challenges to his sentence based on the district court's finding of the loss amount and its application of various sentencing enhancements. We reject each challenge.

### 1.  Loss Amount[4]

The district court accepted the recommendations of the PSR as to the loss calculation. The PSR determined

---

[4] Pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, Sloan submitted copies of the Fourth Circuit's decision in *United States v. Rita*, No. 06-5754, which was before the Supreme Court on the issue of what "reasonableness" presumption, if any, is to be given to sentences within a properly constructed Guideline range. The Supreme Court recently issued its decision in this case, holding that federal appellate courts may apply a presumption of reasonableness to a district court sentence that is within a properly calculated Guideline range. ___ S. Ct. ___, 2007 WL 1772146. This decision, however, does not affect the outcome in this case because Sloan has not raised this challenge in his appeal. While he argues that the district court committed errors in determining the proper sentencing range, Sloan has not argued that his sentence was "unreasonable" when considered under the sentencing factors in 18 U.S.C. § 3553(a).

that the amount of loss incurred by the eight victims named in the indictment and who testified at trial was $2,322. Additionally, the PSR explained that postal inspectors had identified an additional 82 victims, resulting in a total loss incurred by all ninety victims of $19,654.60. The PSR recommended a three-level increase in Sloan's offense level pursuant to USSG § 2F1.1(b)(1)(D) because the loss was between $10,000 and $20,000.

While Sloan raised an objection to the loss calculation, the basis of that objection was the "legal argument" that the jury did not find the specific amount beyond a reasonable doubt. In support of that objection, Sloan cited to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). He did not argue that calculation of the loss amount in the PSR was factually inaccurate. The district court overruled Sloan's objection.

The challenge that Sloan raises here is quite different. He now argues that the district court improperly calculated the loss amount. At sentencing, Sloan stipulated to the loss figure of $19,654.60. He did not reserve the right to argue that the amount was less or that the calculation was factually incorrect. Normally, our review of the district court's factual findings at sentencing is for clear error; and our review of the application of those facts to the Sentencing Guidelines is *de novo*. *United States v. Haddad*, 462 F.3d 783, 793 (7th Cir. 2006). We need not go that far in this appeal, however, because this challenge is precluded by Sloan's stipulation as to the loss amount. By stipulating to the loss amount, he effectively admitted the fact that the loss amount was $19,654.60 and waived any subsequent challenge to this fact. *See, e.g., United States v. Newman*,148 F.3d 871, 876 (7th Cir. 1998) (stipulation waives later denial of relevant conduct). *See also United States v. Gramer*, 309 F.3d 972, 975 (7th Cir. 2002)

(finding that district court properly applied sentencing enhancement pursuant to USSG § 2F1.1(b)(1) based on defendant's stipulation as to loss amount at sentencing hearing). The district court credited this stipulation, and its application of the three-level increase in Sloan's offense level pursuant to USSG § 2F1.1(b)(1)(D) was appropriate.

### 2. Enhancement for Misrepresentation Involving a Religious Organization

Sloan next challenges the district court's application of the two-point sentencing enhancement pursuant to USSG § 2F1.1(b)(4)(A), arguing that the offense did not involve a misrepresentation that Sloan was acting on behalf of a religious organization. At trial, JoAnn Bemiller testified that she had joined the Christian Freedom Foundation after attending a presentation at her sister's house. Her sister had told her that she would receive a machine that would make electricity and give her a return on her money. Ms. Bemiller further testified that she had assumed that this was a good deal because it was a Christian organization. Relying on this testimony, the district court found that Sloan was trading on the religious affiliations of the organization that he had created as part of his scheme to defraud and that, in doing so, misrepresented to his victims that there was a religious purpose advanced by their buying into his schemes and participating in this matrix. We agree with the district court's finding.

USSG § 2F1.1(b)(4) states, in relevant part, "If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government

agency . . . increase by 2 levels."[5] The commentary to this section offers examples of conduct to which § 2F1.1 applies: a defendant who "solicit[s] contributions to a non-existent famine relief organization by mail," or "who diverts donations for a religiously affiliated school by telephone solicitations to church members in which the defendant falsely claims to be a fund-raiser for the school . . . ." The background to this section also specifies that the "guideline is designed to apply to a wide variety of fraud cases." USSG § 2F1.1 comment. (backg'd).

In *United States v. Lilly*, 37 F.3d 1222 (7th Cir. 1994), this Court found the district court's application of the two-level enhancement pursuant to § 2F1.1(b)(4)(A) appropriate where the defendant, a church pastor, sold "Certificates of Deposit," telling potential purchasers that these Certificates of Deposit would be used to finance the improvement or expansion of the Church and to build a retirement complex. *Id.* at 1224-25. The defendant, however, took a significant portion of the proceeds for his own personal use. *Id.* at 1225.

Admittedly, this case does not present as obvious an application of § 2F1.1(b)(4)(A) as *Lilly*. Sloan was less explicit in his offers than the defendant in *Lilly*; he did not make any express promises to use the funds obtained from new members to the Christian Freedom Foundation to advance a specific, religious goal. Instead, Sloan cloaked his fraudulent scheme with the mantle of a religious organization. Through the placement of his advertisements in the Christian Freedom Chronicle, which

---

[5] The district court sentenced Sloan under the guidelines manual effective in 2001. On November 1, 2001, the U.S. Sentencing Commission deleted § 2F1.1 and consolidated its provisions in a revised § 2B1.1. *See* USSG App. C, amendment 617. This change has no effect on Sloan's appeal.

included a special section, "Christian Singles News and Contacts," Sloan clearly targeted a specific audience: Christians. These advertisements were not merely for generators or money-making opportunities, they were solicitations for membership in a "Christian" organization, the Christian Freedom Foundation. Thus, the advertisements created the appearance that a religious organization was involved in and party to the offer, giving the scheme an air of legitimacy. While many of Sloan's victims joined the Christian Freedom Foundation with the aim of gaining free electricity and the chance to make money for themselves, at least one of Sloan's victims, Ms. Bemiller, was duped by the Christian aspect of the organization into thinking that the fraudulent offer was legitimate. Under these circumstances, we find that the district court did not clearly err in applying the two-level adjustment under § 2F1.1(b)(4)(A).

### 3.  Enhancement for More than Minimal Planning

Sloan also challenges the district court's application of the two-level enhancement for "more than minimal planning" under § 2F1.1(b)(2)(A). Because Sloan did not raise this challenge to the district court first, we will review the district court's application of this sentencing enhancement for plain error. *United States v. Cunningham*, 405 F.3d 497, 502 (7th Cir. 2005). Sloan contends that there was no planning other than his preparation and placement of the advertisements in the Christian Freedom Chronicle and, therefore, the enhancement for more than minimal planning was not applicable. We disagree.

On a finding that the defendant engaged in "more than minimal planning," § 2F1.1(b)(2)(A) allows a sentencing court to increase the defendant's offense level by two.

*United States v. Sonsalla*, 241 F.3d 904, 907 (7th Cir. 2001). This enhancement is applicable where "criminal acts, each of which are not purely opportune, are repeated over a period of time." *Id.* (*citing United States v. Brown*, 47 F.3d 198, 204 (7th Cir. 1995)).

In this case, the district court acted within its authority by accepting the recommended findings of the PSR, unchallenged by Sloan, that Sloan's acts were not purely opportune but rather constituted evidence of more than minimal planning. *Id.* at 907-08 (*citing United States v. Mustread*, 42 F.3d 1097, 1101-02 (7th Cir. 1994)). Moreover, Sloan's fraudulent activity spanned several months, during which time he drafted and printed four false advertisements, withdrew money from the bank accounts of his victims, and wrote and mailed checks to his victims under the guise of matrix earnings. These actions were deliberate and made in such a way as to conceal the fraudulent scheme. Thus, the upward adjustment for more than minimal planning was appropriate.

### 4. Enhancement for Mass-Marketing

Finally, Sloan contends that the district erred in applying the three-level, mass-marketing enhancement pursuant to § 2F1.1(b)(3), arguing that this enhancement should not apply to a previously-established newspaper. Again, Sloan failed to raise this argument to the district court, so we will review the application of this enhancement for plain error. *Cunningham*, 405 F.3d at 502.

Application note 3 to § 2F1.1 of sentencing guidelines define "mass-marketing" as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit." USSG § 2F1.1, comment. (n. 3).

Nothing in the sentencing guidelines or the application note suggests that mass-marketing is limited to instances involving newly-created newspapers and the like, and we reject such a narrow interpretation. *See United States v. Magnuson*, 307 F.3d 333, 334 (5th Cir. 2002) (rejecting narrow construction of "mass-marketing" that would limit application of § 2F1.1(b)(3) to "active" rather than "passive" solicitations). The definition of "mass-marketing" is not limited to telephone, mail, or Internet solicitations but includes "other means." Sloan used such "other means," the Christian Freedom Chronicle, to reach a large number of individuals in order to have them pay to join the Christian Freedom Foundation. Accordingly, the district court's application of the mass-marketing enhancement was appropriate.

## III.  Conclusion

For the foregoing reasons, Sloan's judgment of conviction and sentence are AFFIRMED.

FLAUM, *Circuit Judge*, dissenting in part.  I join the majority's opinion with the exception of part IIC2. Because I believe that the district court erred by increasing Sloan's sentence under § 2F1.1(b)(4)(A), I respectfully dissent from that section. The rationale for the enhancement is that "defendants who exploit victims' charitable impulses or trust in government create particular social harm." U.S.S.G. § 2F1.1(b)(4)(A). The Guidelines commentary provides examples of such conduct to which this factor applies, including:

> a group of defendants who solicit contributions to a non-existent famine relief organization by mail, a defendant who diverts donations for a religiously-affiliated school by telephone solicitations to church members, which the defendant falsely claims to be a fund-raiser for the school . . . .

U.S.S.G. § 2F1.1(b)(4)(A), application note 5. In these examples, contributions or donations are an integral part of the fraudulent schemes that warrant the enhancement.

This Court has only decided one case dealing with an upward enhancement under § 2F1.1(b)(4)(A), and it too involved a scheme that exploited charitable donations. In *United States v. Lilly*, 37 F.3d 1222, 1228 (7th Cir. 1994), this Court affirmed the enhancement for a defendant church pastor who told his victims that their certificates of deposit would be used to finance improvement of the church when in reality he used the money for his family's personal expenses.

I find this case distinguishable from *Lilly* and the Guidelines examples because Sloan's scheme did not take advantage of the victim's charitable impulses; rather, it took advantage of their desire to make money and receive a free electricity generator. Indeed, the majority acknowledges that the victims testified that "they would not have paid to join the Christian Freedom Foundation had they known that they would not receive the generator or would receive less money in matrix payments than they had paid to the organization." *See supra* p. 7.

The majority relies on the fact that Bemiller testified that she trusted the solicitation because the Christian Freedom Foundation was a Christian organization. Bemiller testified that she "wrote out the check. It sounded good. It had 'Christian' on it, so I thought well, this has got to be good." Although Bemiller trusted the

scheme because it was being orchestrated by a Christian organization, she did not subscribe to the organization because of its Christian purpose. She, like all of the other victims, subscribed because she thought that she would get a free electricity generator and a financial windfall. In my view, Sloan did not exploit his victims' charitable impulses, and therefore I would hold that the district court erred when it enhanced his sentence under § 2F1.1(b)(4)(A).

A true Copy:

      Teste:

                  _____
                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*