[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10030

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DONALD JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cr-00318-JPB-RGV-1

_____

Before LUCK, ABUDU, and ANDERSON, Circuit Judges.

PER CURIAM:

Donald Johnson appeals his sentence of 103 months and 15 days' imprisonment for possessing a firearm as a felon, in violation of 18 U.S.C. section 922(g)(1). He argues that the district court erred by: (1) applying the obstruction enhancement to calculate his guideline range; (2) applying the firearm discharge enhancement in calculating his guideline range; and (3) failing to consider the guideline requiring that a federal sentence run concurrent to an anticipated state sentence. Because we agree on that last point, we vacate Johnson's sentence and remand for resentencing.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In the early morning hours of July 22, 2021, Dionna Scott called 911 to report a domestic incident. Officers made contact with Scott. She told them that, during an argument, Johnson struck her once in her left eye and once in her mouth, and shot a gun at her. Officers observed that Scott was injured in her left eye, mouth, and jaw, and was still distraught from her encounter with Johnson.

Scott told the officers that, after punching her in the eye and mouth that day, Johnson went to their bedroom and retrieved a firearm from underneath their bed. He pointed it at Scott, twirled it in her face, and told her, "I can kill you, Dionna." Then he fired the gun into the floor. Scott dialed 911 and left the apartment. Johnson followed her into the apartment complex's parking lot,

and he attempted to hide the gun near a parked car.  Scott grabbed the gun and threw it into the nearby woods, which made Johnson angry.  He began hitting Scott again and forced her to go into the woods to look for the gun, but she couldn't find it.  He then punched Scott in the jaw, and she lost consciousness.  Once she woke up, she retrieved her car keys and left the apartment complex.  She flagged down a police car as it pulled into a nearby parking lot and tearfully told the officer interviewing her that she had called 911 because Johnson had hit her, threatened to kill her, and "shot at" her.

The officers arrested Johnson.  They spent a "very short period of time" in the apartment while they arrested Johnson; while there, they did not search the apartment to locate any bullet holes. The officers did search the woods, however, where Scott had told them she threw the gun.  They found a loaded handgun.  Meanwhile, Scott was transported to a hospital, where she learned that her jaw had been broken.  She needed two surgeries to correct the damage to her jaw.

When officers interviewed Scott in the hospital, Scott again stated that Johnson had "pulled a gun out from up under the bed, and he twirled it around and said, "I'll kill you right now Dionna." "And when he shot it at me, it went pow!"

After arresting Johnson, officers booked him into the Fulton County Jail, where he made numerous recorded calls to Scott. During those calls, Scott recounted repeatedly how Johnson threatened her, pointed a gun at her, shot at her, struck her in the face,

and broke her jaw.  Johnson responded by apologizing, saying he loved her, and replying, "I didn't mean to do that." At other times, Johnson was silent when Scott discussed his firing the gun.

In August 2021, a federal grand jury indicted Johnson on one count of possessing a firearm as a convicted felon, based on his conduct on July 22.  That same month, Scott told Johnson in a jail call that the FBI contacted her asking about him.

In September 2021, Scott and Johnson's jail call discussions began to change; Scott no longer expressed anger towards Johnson hitting and threatening her.  Instead, Johnson began asking Scott for help to get him out of custody by filing an affidavit recanting her initial statements to the police.

In one call, he told Scott, "You can't be scared." "I mean, it's easier said than done," responded Scott. "What are you talking about?" Johnson replied. "I'm the one in here!" "Ok," said Scott, "my [911] phone call and what happened is the reason that you're there." "That's what I'm saying," said Johnson. "All I need you to do, baby, and I don't want you to get frustrated, but all I need you to do is help get me out of here. . . . That's all I need, that's all I've been asking." "That's all I've been trying to do," Scott replied. "I should have went down to the courthouse today, but I had a meeting with the director of the safehouse [domestic violence shelter]." Johnson pressed her, "You said you were going to go down there [to the courthouse] today? Go down there on Monday!" "I'm going to go down there on Monday," said Scott, "It's just been a lot, so I've been trying to get situated." "They're trying to build it,

man," said Johnson, "but without you they don't got nothing. If you say to these boys what you just said to me, it will be over." "So you need to get that piece of paper, get that paper, and take it down there with you. I need your whole press, like, for real." "I know," Scott replied. In another call, Johnson told her, "I need you to get that affidavit."

That same month, a state grand jury indicted Johnson for aggravated battery, two counts of aggravated assault (family violence), battery – family violence, reckless conduct, simple battery, and possession of a firearm by a convicted felon.

As directed, Scott filed the affidavit in Johnson's Fulton County case. She averred that her previous statements and the recordings from the incident on July 22 "were a misunderstanding and a misrepresentation" of Johnson. She swore that the police coerced her "to make up things" that would "give them creditable [sic] reasons to incarcerate" Johnson, and they told her to "lie so that they could do their jobs." And Scott wrote that she was "not in [her] right state of mind," was "under the influence and not able to think for herself" when she made those statements. She said she "could not remember anything that happen[ed] verbatim." And Johnson, not Scott, was the "victim" here. Specifically, he was the victim of her "malicious and devious ways." Scott said "it should be [her] behind bars serving time" rather than Johnson. She "beg[ged]" the state to "drop all charges" and allow Johnson to come home. Her "life has changed tremendously since [the incident]," she explained, so Johnson "will not be coming back to what

he left." Scott specifically mentioned the firearm in her affidavit, claiming that she "took the weapon and tossed it without [Johnson] knowing."

Johnson entered a guilty plea to his federal charge in September 2022. The probation office prepared Johnson's presentence investigation report, recommending three enhancements to his guideline range: one for obstructing justice; one for discharging a firearm; and one for causing Scott serious bodily injury. After applying a two-level reduction for acceptance of responsibility and a criminal history category of V, the probation office calculated Johnson's guideline range as 92 to 115 months imprisonment.

Johnson objected to the firearm discharge enhancement, and the obstruction enhancement. In objecting to the firearm discharge enhancement, Johnson argued that there was insufficient evidence that he fired the gun. And as to the obstruction enhancement, Johnson countered that he was not charged with obstruction of justice, and moreover, his words to Scott did not actually influence her to file the affidavit. Scott testified as a witness for Johnson. She insisted that filing the affidavit was her idea, not Johnson's, and he never influenced her decision to file the affidavit recanting her previous testimony.

The district court overruled Johnson's objections, and sentenced him to 103 months and 15 days' imprisonment to be followed by three years of supervised release. Johnson appeals his sentence.

After he appealed, Johnson resolved his state court charges. He pleaded guilty to one count of aggravated battery. The Fulton County Superior Court sentenced him to four years in state prison, to be followed by eight years of probation, which he began serving prior to his federal sentence. The Fulton County Superior Court ordered Johnson's state sentence to run concurrent to his federal sentence.

## STANDARD OF REVIEW

In considering whether the district court erred in imposing a sentencing enhancement, we review for clear error a district court's factual findings and de novo its application of those findings to the guidelines. *See United States v. Doe*, 661 F.3d 550, 565 (11th Cir. 2011). A factual finding is clearly erroneous when we review the evidence and are left with a "definite and firm conviction that a mistake has been committed." *United States v. Barrington*, 648 F.3d 1178, 1195 (11th Cir. 2011) (marks omitted). We review for plain error sentencing issues raised for the first time on appeal. *United States v. Bonilla*, 579 F.3d 1233, 1238 (11th Cir. 2009).

We give considerable deference to a district court's credibility findings, "because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). The district court's "choice of whom to believe is conclusive . . . unless the judge credits *exceedingly* improbable testimony" or the evidence is "contrary to the laws of

nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.* (quotation omitted)

## DISCUSSION

Johnson raises three arguments on appeal. First, Johnson contends that the district court erred by applying the obstruction enhancement to calculate his guideline range. Second, he asserts that the district court erred by applying the firearm discharge enhancement to calculate his guideline range. And third, Johnson maintains that the district court erred by failing to consider the guideline requiring that his federal sentence run concurrent to his anticipated state sentence. We address each argument in turn.

### A. The District Court Did Not Err in Enhancing Johnson's Sentence for Obstruction of Justice

Johnson first argues that the government failed to offer reliable and specific evidence that he attempted to obstruct justice. He contends that no evidence showed he attempted to *"unlawfully"* influence Scott because his influence over her was never coercive, threatening, or illegal. Rather, his calls asking her to recant were merely "a couple discussing how to fight a criminal case, a matter of clear mutual concern." Therefore, Johnson says, the district court erred by applying obstruction enhancement under section 3C1.1.

Under the obstruction enhancement, the district court may impose a two-level enhancement if it finds that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede,

the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1.  The court must find that a defendant acted "willfully" to justify an enhancement for obstruction of justice, which means that the defendant must have acted "consciously" and "with the *purpose* of obstructing justice."  *United States v. Revel*, 971 F.2d 656, 661 (11th Cir. 1992) (marks omitted).

Applied here, Johnson obstructed his federal prosecution by pressuring Scott to recant her statements to the officers.  Scott she initially called the police on July 22 to report that Johnson had hit her, threatened to kill her, and fired a gun at her.  When police met with her, she was distraught, bruised, and a medical examination found that her jaw had been broken.  These events are what led to Johnson's state and federal charges.

But later, after several calls with Johnson, Scott completely changed her story.  The government provided recordings of phone calls between Johnson and Scott in which Johnson presses Scott to file an affidavit recanting her testimony. Scott then "beg[ed]" the court in her affidavit to drop his charges, claiming that the police coerced her into lying, she had been "under the influence" of alcohol, Johnson—not Scott—was the true victim, and she has changed enough for her relationship with Johnson to work this time.  Scott spoke about the firearm in her affidavit, claiming that she "took the weapon and tossed it without him knowing, afraid that the police would find it and charge me since I lived in the apartment at the time, not my husband."  The district court was well within its

discretion to review Scott's change of story, read the affidavit, listen to her calls with Johnson, observe her demeanor as a witness, compare her testimony to the other evidence, and conclude that Johnson's statements asking for Scott's "whole press" to "get that affidavit" constitute a willful attempt by Johnson to solicit false testimony from Scott in order to "obstruct . . . the administration of justice with respect to the investigation, prosecution, or sentencing" of his felon in possession of firearms charge.

We have not overlooked *United States v. Hall* 349 F.3d 1320 (11th Cir. 2003). There, the government "relied solely on Hall's status as a pastor" to justify the sentencing enhancement for abusing a position of trust. *Id.* at 1325. The government in that case failed to provide "any" evidence that he had personally held a position of trust with "even one victim." *Id.* But as we have explained, here, there was ample evidence for the district court to conclude that Johnson maintained significant influence over Scott. Scott's recanting is itself evidence of his influence, especially when combined with his requests for the affidavit on the jail calls. The district court's determination that Johnson attempted to obstruct justice was not "contrary to the laws of nature" nor was it "inconsistent or improbable on its face that no reasonable factfinder could accept it." *Ramirez-Chilel*, 289 F.3d at 749. And even if Scott's "love was at least as compelling a reason as fear" in motivating her to recant, as Johnson contends, we have said that, where there are "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Stewart*, 65 F.3d 918, 926 (11th Cir. 1995).

As a fallback, Johnson argues that he could not have "willfully" attempted to obstruct justice in his *federal* case because he asked Scott to file an affidavit in his *state* case. The obstruction enhancement, he maintains, only applies to "the instant offense of conviction," which was the state case when their conversation took place.

But we've held that "an obstruction-of-justice enhancement is applicable where the defendant's conduct obstructed a state investigation, which later turned into a federal investigation." *United States v. Frasier*, 381 F.3d 1097, 1100 (11th Cir. 2004). In *Frasier*, "[b]ecause an FBI agent had informed [the defendant] prior to his attempted escape that the federal government was going to prosecute him," we concluded that the district court was justified in imposing the obstruction-of-justice enhancement in his federal sentence. *Id*.

Here, too, Johnson was aware of his federal charge before attempting to obstruct justice in his jail calls with Scott in September 2021. A federal grand jury had already indicted Johnson on his federal charge on July 21, 2021, and Johnson knew that the FBI was investigating him about a month before he attempted to pressure Scott to recant, because Scott had told Johnson in an August 2021 jail call that the FBI had contacted her to ask questions about him. Johnson also admits that both the federal and state cases "contemplate the same criminal conduct constituting the 'instant offense' in section 3C1.1." Accordingly, the district court did not err when

it imposed on Johnson a two-level sentence enhancement for obstruction of justice.

### B.  The District Court Did Not Err in Enhancing Johnson's Sentence for Discharging a Firearm

Johnson next contends that the district court erred when it calculated his guideline range based on the enhancement for discharging a firearm because the government failed to show that he fired the gun.  We disagree.

Scott consistently stated that Johnson fired the gun.  When law enforcement first interviewed her, she told them that Johnson had just shot at her.  Shortly after, when law enforcement interviewed Scott at the hospital, Scott again said that Johnson fired the gun.  And on the jail calls with Johnson, Scott repeated that Johnson shot the gun.  Based on all of this, the district court did not err in finding that Johnson fired the gun.  *See Ramirez-Chilel*, 289 F.3d at 749.

Johnson argues that the evidence is insufficient because Scott recanted her initial testimony, and in addition, his and Scott's statements on the jail calls are unreliable hearsay.  Johnson admits that hearsay is admissible at sentencing, but he insists that hearsay evidence is reliable only when it is corroborated by other evidence in the record.  The government failed at that task, he argues.  He points to the government's failure to proffer any physical evidence, such as photographs of a bullet hole in the apartment.  Moreover, the government declined to cross-examine Scott when she recanted.

We have said that a district court may consider "any information (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the information is sufficiently reliable." *United States v. Wilson*, 183 F.3d 1291, 1301 (11th Cir. 1999). The district court may rely on hearsay "as long as the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." *United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998).

The district court properly considered the evidence that Johnson shot the firearm. It made an explicit finding of fact as to the credibility of Scott's statements, and Johnson had an opportunity to rebut the evidence. The district court relied on the fact that Scott remarked several times in jail calls to Johnson, "you shot at me" and Johnson responded by apologizing, saying he loved her, and replying, "I didn't mean to do that." The jail calls are corroborated by Scott's contemporaneous statements to police that Johnson shot at her, captured by police body cameras, and by the fact that they found a firearm in the woods where Scott told them she had thrown it. Even without forensic evidence, Scott's statements were sufficient for a district court to conclude that Johnson fired a gun at Scott. Thus, the district court did not err when it imposed a five-step enhancement to Johnson's sentence for discharging a firearm under section 2A2.2(b)(2)(A).

*C.  The District Court Plainly Erred by Failing to Consider Whether Johnson's Federal Sentence Should Run Concurrently with His Anticipated State Sentence*

Johnson finally argues that the district court erred by failing to consider the guideline (section 5G1.3(c)) requiring that his federal sentence run concurrent to his anticipated state sentence. Johnson didn't raise this objection at his sentencing hearing so we review it for plain error.

To show plain error, there must be "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013) (quotation mark omitted).  A defendant demonstrates that an error affected his substantial rights when he shows a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (marks omitted).

Under section 5G1.3(c), if "a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction," then "the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment." U.S.S.G. § 5G1.3(c).  Although a district court is not required to follow the guidelines, a "court must consult those [g]uidelines and take them into account when

sentencing." *Molina-Martinez*, 578 U.S. at 193 (marks omitted); *see also United States v. Henry*, 1 F.4th 1315, 1320–21 (11th Cir. 2021) (recognizing that district courts must "establish[] the procedural reasonableness of a sentence" by "consult[ing] those [g]uidelines and tak[ing] them into account when sentencing"). "Failure to calculate the correct [g]uidelines range constitutes procedural error." *Peugh v. United States*, 569 U.S. 530, 537 (2013). And "courts must correctly determine whether the [g]uidelines recommend concurrent sentences." *United States v. Nania*, 724 F.3d 824, 830 (7th Cir. 2013). "Failure to do so results in procedural error." *Id.*

Here, the district court erred. It did not consider section 5G1.3(c), which required that Johnson's federal sentence run concurrent to his anticipated state sentence. And that error was plain because the language of the guideline was plain.

The plain error also affected Johnson's substantial rights. The district court sentenced Johnson to 103 months and 15 days' imprisonment for possessing a firearm as a felon. In his state case, in which he was convicted for aggravated battery, the Fulton County Superior Court sentenced Johnson to four years in state prison, to be followed by eight years of probation. The state took custody of Johnson first, so he will serve his state sentence for four years before beginning his federal sentence. Johnson will therefore serve four more years in custody for the same conduct than he would have served if the district court had ordered his federal sentence to run concurrent to his state sentence.

The government responds that the district court's plain error will not affect Johnson's substantial rights because the state court already ordered the state sentence to run concurrently with his federal sentence.  But because Johnson will complete his state sentence first, "it will always be *the Federal Government* . . . that decides whether he will receive credit [to his federal sentence] for the time served in state custody." *Setser v. United States*, 566 U.S. 231, 241 (2012) (emphasis added).  Despite its recommendation, the state cannot order the federal government to credit Johnson with the time he spent serving his state sentence to his federal sentence.  Only the federal government can make that determination.

As to the fourth prong of the plain error test, it is usually met if the error affects a defendant's substantial rights. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908–10 (2018).  When the district court failed to consider section 5G1.3(c) in sentencing Johnson, "[t]he risk of unnecessary deprivation of liberty" undermined "the fairness, integrity, or public reputation of judicial proceedings . . . ." *Id.*

## CONCLUSION

While we agree with the government that the district court did not err in applying the obstruction and firearm discharge enhancements in calculating Johnson's guideline range, we vacate his sentence because the district court plainly erred in failing to consider the requirement in section 5G1.3(c) that the federal sentence run concurrent to Johnson's anticipated state sentence.  On remand, the district court is not required to run the sentences

23-10030                  Opinion of the Court                  17

concurrent.  But it must consider section 5G1.3(c), and the other relevant guidelines and statutes, before making that decision.

**SENTENCE VACATED AND REMANDED.**