**NOT FOR PUBLICATION**

# In the
# United States Court of Appeals
## For the Eleventh Circuit

————————————

No. 24-13409

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

EMILIYA RADFORD,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:23-cr-00038-MTT-CHW-1

————————————

Before JILL PRYOR, BRANCH, and KIDD, Circuit Judges.

PER CURIAM:

Emiliya Radford was convicted of bank fraud, in violation of 18 U.S.C. § 1344(2); wire fraud, in violation of 18 U.S.C. § 1343; and federal program theft, in violation of 18 U.S.C. § 666(a)(1)(A).

The district court imposed a total sentence of 66 months' imprisonment and ordered her to pay $298,042.72 in restitution. On appeal, Radford challenges her conviction for the federal program theft charge, the district court's application of several sentencing enhancements, and the restitution order. After careful consideration, we affirm.

## I.    FACTS AND PROCEDURAL HISTORY

The charges in this case arose from actions Radford took while working as a contractor and later an employee of Smith Spinal Care Center ("SSCC"), a Georgia chiropractic office owned and operated by James C. Smith. Radford initially provided marketing services to SSCC through her marketing company, Cyber Pinecone, LLC. At first, the parties agreed that Cyber Pinecone would provide digital marketing services in exchange for Radford and her husband receiving free chiropractic care. Later, in October 2019, the parties agreed to a 10-month contract in which SSCC would pay Cyber Pinecone $2,950 per month for Radford's digital marketing services. They eventually extended this contract to 24 months and increased the payment to $3,900 per month.

In April 2020, SSCC hired Radford as its office manager. While acting as office manager, she continued to perform her digital marketing duties. About four months after starting as office manager, she signed an agreement with SSCC on behalf of Cyber Pinecone that provided for an early termination of the digital marketing agreement. This new agreement provided that the contract, which originally had a 24-month term set to end in Oc-

tober 2021, would end in January 2021 and then proceed on a month-to-month basis with a 30-day termination upon notice.

The month after Radford became office manager, SSCC received a $150,000 loan from the Small Business Administration ("SBA"). The next day, Radford was added as an authorized signer on SSCC's bank account so that she could issue and sign biweekly payroll checks. A few weeks later, Radford used SSCC funds to purchase approximately $5,000 of computer products, including a MacBook Pro laptop, a HomePod smart speaker, and Microsoft Office software. She had these products delivered to her home. Smith, who supervised Radford and was the only other authorized signer on SSCC's bank account, neither authorized these purchases nor allowed her to bring work computers home.

Radford also used her access to SSCC's bank account to increase her pay. When she was hired, SSCC agreed to pay her $18 per hour, or $37,440 per year. At this rate, she should have received $98,640 in gross pay for her employment from May 2020 to December 2022. Instead, by incrementally increasing and at times duplicating her paychecks, she paid herself $110,517.45 in net salary and $30,225.04 in unauthorized benefits and fees.

Radford also issued nearly $220,000 in unauthorized checks from SSCC's bank account to Cyber Pinecone. For example, she executed a fake service agreement for "consulting services for Amazon KDP" and, ostensibly under the agreement, issued a

$16,000 check to Cyber Pinecone. Doc. 136 at 257.[1] In reality, she used this money to pay an e-commerce service for help self-publishing an e-book about cat ownership.

Radford paid herself another unauthorized consulting fee for filing an application to increase SSCC's existing SBA loan from $150,000 to $500,000. To receive the loan, she signed an Amended Loan Authorization Agreement on SSCC's behalf in which she certified that "[n]o fees ha[d] been paid, directly or indirectly, to any representative . . . for services provided or to be provided in connection with applying for or closing this [l]oan" and that "[a]ll fees not approved by SBA [were] prohibited." Doc. 97-126 at 5. Yet she issued Cyber Pinecone a $17,500 "Consulting Fee" from SSCC's bank account the day after SSCC received the loan increase. Doc. 97-236 at 1.

On November 29, 2022, SSCC notified Cyber Pinecone that it was terminating the contract in 30 days. Less than a month later, Radford resigned from her position with SSCC. Within three days of her resignation, Smith reported to law enforcement her suspected theft. A grand jury later charged her with bank fraud, wire fraud, and federal program theft.[2] The federal program theft

---

[1] "Doc." numbers refer to the district court's docket entries.

[2] The indictment charged Radford with multiple counts of each charge. The government voluntarily dismissed most of the counts, proceeding to trial only on Count 1 (bank fraud), Count 2 (wire fraud), and Count 6 (federal program theft).

count of the indictment charged her with using SSCC funds to purchase Apple brand products and listed those products by serial number.

Radford pleaded not guilty and proceeded to trial. The government's witnesses at trial included former SSCC employees, the FBI agent who investigated the case, and Smith. Smith testified that he did not authorize Radford's pay increases or Apple product purchases. He also testified that she was largely responsible for executing the SBA loan increase, explaining that he was aware of the application but did not know the loan's terms, did not read the loan agreement closely, and did not authorize any additional payment to Radford for applying for the loan.

After the government presented its case, Radford moved for a judgment of acquittal based on insufficient evidence. The district court reserved ruling on the motion. Radford presented no evidence to the jury, and the jury convicted her on all counts. After her conviction, the court denied her motion for judgment of acquittal.

Before Radford's sentencing, a probation officer prepared a presentence investigation report ("PSR"). The PSR calculated the total amount of her unauthorized purchases and payments while employed by SSCC at $303,893.59. That figure included, among other things, more than $200,000 in unauthorized payments to Cyber Pinecone, roughly $63,000 in unauthorized pay increases, and approximately $11,000 in Apple product purchases.

The PSR then addressed Radford's offense level. It assigned a base offense level of 7. It then applied a 12-level enhancement because the loss exceeded $250,000 but was less than $550,000. *See* U.S. Sent'g Guidelines Manual § 2B1.1. The PSR also applied other enhancements, including a two-level increase because the offense resulted in substantial financial hardship to the victim, *id.* § 2B1.1(b)(2)(A)(iii); a two-level increase because the offense involved conduct described in 18 U.S.C. § 1040,[3] *id.* § 2B1.1(b)(12); a two-level increase because Radford abused a position of trust or used a special skill, *id.* § 3B1.3; and a two-level enhancement for obstruction of justice, *id.* § 3C1.1. The PSR thus reported that Radford's total offense level was 27. Given her criminal history category of I, the PSR calculated her advisory range under the Sentencing Guidelines as 70 to 87 months' imprisonment.

Radford objected to most of the enhancements. She acknowledged that the 12-level enhancement based on the loss amount was "appropriate and not disputed." Doc. 116 at 3. But she objected to the remaining enhancements. The district court overruled all but her objection to the obstruction enhancement. As to the § 1040 enhancement, the district court found that Rad-

---

[3] As relevant here, 18 U.S.C. § 1040 criminalizes "mak[ing] any materially false, fictitious, or fraudulent statement or representation, or mak[ing] or us[ing] any false writing" in "any matter involving" benefits connected with a major disaster declaration. Here, the SBA loan that SSCC received was a part of the economic injury disaster loan program designed to support small businesses during the Covid-19 pandemic.

ford "prepared the [loan] application" and "indirectly made arrangements to receive a consulting fee for obtaining the loan." Doc. 139 at 28. As to the position of trust enhancement, the court concluded that she "had considerable discretion" that "she was able to abuse." *Id.* at 31.

After removing the obstruction enhancement, the district court calculated her total offense level as 25 and her guidelines range as 57 to 71 months' imprisonment. The court ultimately sentenced her to 66 months' imprisonment and three years of supervised release. The district court also imposed restitution in the amount of $298,042.72, as well as a mandatory assessment of $300. This is Radford's appeal.

## II.    STANDARDS OF REVIEW

We review *de novo* the denial of a motion for a judgment of acquittal based on sufficiency of the evidence. *United States v. Pirela Pirela*, 809 F.3d 1195, 1198 (11th Cir. 2015). In reviewing the sufficiency of the evidence, we view the record in the light most favorable to the government and resolve all reasonable factual inferences in favor of the jury's verdict. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). The evidence is sufficient if a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.* at 1284–85. The evidence need not exclude every reasonable hypothesis of innocence to be sufficient. *United States v. Bell*, 112 F.4th 1318, 1331 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025).

We ordinarily review *de novo* whether an indictment was constructively amended at trial. *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). But when, as here, a defendant raises a constructive amendment claim for the first time on appeal, we review for plain error only. *Id.* Under this standard, we may correct an error raised for the first time on appeal only when (1) an error has occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* "An error cannot be plain unless the issue has been specifically and directly resolved by the explicit language of a statute or rule or on point precedent from the Supreme Court or this Court." *United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019).

We review a district court's application of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Westry*, 524 F.3d 1198, 1218 (11th Cir. 2008). "We will not find clear error unless our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003) (citation modified). However, if a party does not object to the procedural reasonableness of her sentence before the district court, we review for plain error only. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). A district court's conclusion that the defendant's conduct justifies an enhancement is a question of law that we review *de novo*. *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998).

Normally, we review the legality of a restitution order *de novo* and its underlying factual findings for clear error. *United States v. Utsick*, 45 F.4th 1325, 1332 (11th Cir. 2022). When, as here, a defendant fails to object to a restitution order at sentencing, we review only for plain error. *Id.* And a district court does not plainly err when its restitution order relies on undisputed facts contained in the PSR. *United States v. Hasson*, 333 F.3d 1264, 1276 (11th Cir. 2003) ("[A] sentencing court does not commit plain error by relying on factual findings contained in the PSR . . . when the defendant does not introduce evidence on the issue or object to the PSR's findings in that regard.").

## III.    DISCUSSION

On appeal, Radford challenges her federal program theft conviction and her sentence. We address each issue in turn.

### A. Radford's Challenge to Her Conviction for Federal Program Theft Fails.

Radford challenges her conviction on Count Six for federal program theft under 18 U.S.C. § 666. To establish that a defendant violated this statute, the government must prove beyond a reasonable doubt that:

> (1) the defendant was an agent of an organization;
> (2) the organization receives more than $10,000 from a federal grant program in one year; [and]
> (3) the defendant embezzled, stole, obtained by fraud, or otherwise without authority knowingly converted or intentionally misapplied property val-

ued at $5,000 or more that was under the organiza-
tion's care, custody, or control.

*United States v. Williams*, 527 F.3d 1235, 1240 (11th Cir. 2008). Un-
der § 666, "property" includes money. *Kelly v. United States*,
590 U.S. 391, 398 (2020).

Radford raises two challenges to her conviction for federal
program theft. First, she argues that the government constructive-
ly amended the indictment because it listed specific computers by
serial number in the indictment but then presented at trial evi-
dence of a computer not listed in the indictment. Second, she ar-
gues that the evidence at trial was insufficient to support a convic-
tion on this count. For the reasons we explain below, both argu-
ments fail.

### 1. The Indictment Was Not Constructively Amended at Trial.

Radford argues that the government constructively
amended the federal program theft count of the indictment. She
asserts that the government made the Apple computers an essen-
tial element of the charge by specifically identifying them in the
indictment by serial number. According to Radford, the govern-
ment therefore altered the essential elements of the charge by
presenting evidence of computers different than those listed in the
indictment. We disagree.

"The Fifth Amendment's Due Process Clause guarantees
that a defendant can be convicted only of crimes charged in an
indictment." *United States v. Howard*, 28 F.4th 180, 201 (11th Cir.

2022). "A constructive amendment to an indictment occurs when the theory or evidence presented by the government or the jury instructions alter the 'essential elements' of the offense contained in the indictment to broaden the possible bases for conviction beyond what is charged." *United States v. Leon*, 841 F.3d 1187, 1192 (11th Cir. 2016) (citation modified). If evidence at trial does not alter an essential element of the offense charged, there is no constructive amendment. *See Howard*, 28 F.4th at 201.

In *Howard*, we held that the government did not constructively amend an indictment charging the defendant with paying an illegal kickback when the government presented evidence at trial of two kickback checks even though the indictment only mentioned one. *Id.* We explained that there was no constructive amendment because "the amount of the kickback paid is not an element of the offense." *Id.*

We similarly conclude that there was no constructive amendment here. Although the indictment listed specific property, the specific property listed in the indictment is not an element of the offense under § 666. That Radford converted more than $5,000 dollars and used it for slightly different items than those listed in the indictment "does not alter those elements, much less broaden them," so the government did not constructively amend the indictment. *See id.*

Radford resists this conclusion, pointing to our decision in *United States v. Achey*, 943 F.3d 909 (11th Cir. 2019). In *Achey*, a defendant was charged with conspiring to possess a controlled sub-

stance. *Id.* at 912. The indictment specified that the defendant's violation "involved" a mixture and substance containing a detectable amount of fentanyl and another controlled substance known as DMT. *Id.* After the defendant was convicted, he argued that the government's evidence was inadequate because it failed to show that there was a conspiracy to distribute fentanyl or DMT, as opposed to a generic controlled substance. *Id.* at 913.

We rejected this argument. After looking to our precedent and the particular drug statutes at issue, we explained that "whether the government is required to prove a conspiracy to distribute a specific substance depends on the role the specific substance plays in the indictment." *Id.* at 915. "If the reference to the specific substance in the indictment, fairly read, charges that the defendant conspired to violate § 841 with the specific substance as an element, then a subset of the offense is charged, and the government must prove the defendant's mens rea regarding the specific substance." *Id.* But "if the specific substance is referenced only for sentencing purposes, the government is not required to prove the defendant's mens rea regarding the specific substance, and proof of the defendant's mens rea regarding generic controlled substances will suffice." *Id.* at 915–16. Because the reference to the specific substance in *Achey* was only for sentencing purposes, we concluded that the indictment charged a conspiracy to distribute a generic controlled substance and included the specific substances involved only for sentencing purposes. *Id.* at 916.

We fail to see how *Achey* helps Radford here. She has identified no authority establishing that § 666 sets forth different offenses for particular types of property such that the specific property involved is an element of the offense. The government therefore need not put on evidence of the specific property identified in the indictment; it need only prove the essential elements of the offense. We thus conclude that there was no error, let alone plain error, here.

### 2. The Evidence Was Sufficient to Support Radford's Conviction for Federal Program Theft.

Radford next argues that the government failed to prove that she converted "property valued at $5,000 or more" because it introduced no evidence that the specific computers identified in the indictment were located after investigation. *See* § 666. But the government needed to prove only that Radford converted property, including money, valued at over $5,000. It did so.

At trial, the government introduced evidence based on Apple records and SSCC's Wells Fargo bank records that Radford spent at least $5,164.73 of SSCC's money to buy computer products that were neither authorized by SSCC nor used in SSCC's business. These products were shipped to Radford's address and later recovered at her home. Viewed in the light most favorable to the government, this evidence was sufficient to allow a reasonable jury to find that she converted SSCC's money for her own use, which satisfied the property element under § 666. *See Williams*, 527 F.3d at 1245; *Kelly*, 590 U.S. at 398–99. Because a reasonable

factfinder could have found Radford guilty beyond a reasonable doubt of federal program theft, the district court did not err in denying her motion for acquittal.

## B. Radford's Challenges to Her Sentence Fail.

Radford also challenges enhancements the district court applied to her sentence and its restitution order. First, she argues that the district court erred when applying a 12-level increase to her offense level under U.S.S.G. § 2B1.1(b)(1)(G) based on the loss amount. Second, she argues the district court plainly erred in calculating the restitution amount. Third, Radford argues that the district court clearly erred in determining that the U.S.S.G. § 2B1.1(b)(12) enhancement for conduct involving 18 U.S.C. § 1040 applied because: (1) she did not make a false statement, (2) her conduct did not satisfy the elements of § 1040, and (3) the application of the enhancement resulted in impermissible double counting. Fourth, Radford argues that the district court erred in applying the U.S.S.G. § 3B1.3 enhancement for abusing a position of private trust and erred in determining she abused a position of trust with SSCC. Below, we consider each argument in turn.

### 1. The District Court Did Not Err in Increasing Radford's Offense Level Under § 2B1.1(b)(1)(G).

Radford challenges the district court's application of a 12-level increase under U.S.S.G. § 2B1.1(b)(1)(G) because, she says, the district court erred in calculating the loss amount. She argues that the court should have excluded from the loss amount the

$203,206 that SSCC paid Cyber Pinecone under the parties' contract. She asserts that these payments were not fraudulent and thus should not have been included with the loss amount. She also argues that the district court erred in including in the loss amount $11,015.67 in Apple products because the government failed to prove that she possessed them. According to Radford, the correct loss amount was $95,721.77, which would have resulted in an eight-level, not a 12-level, increase to her offense level under § 2B1.1(b)(1)(6).

Before we can consider the merits of Radford's arguments, we must address the government's contention that she invited any error in the calculation of the loss amount. According to the government, she waived appellate review of the district court's loss-amount determination because she affirmatively relinquished the argument. Radford responds that there was no invited error because her trial counsel, who was barred in a different jurisdiction with different standards for invited error, did not *intend* to waive the error.

When a party "induces or invites" the district court's error, this Court is "precluded from reviewing that error on appeal." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009). The invited error doctrine applies when an error is attributable to the action of the defendant, *United States v. Duldulao*, 87 F.4th 1239, 1255 (11th Cir. 2023), and "stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal." *Brannan*, 562 F.3d at 1306. We clari-

fied in *United States v. Boone* that when a defendant "expressly represent[s] to the district court in [her] sentencing memorandum" that a certain enhancement applies, she has invited the district court's error. 97 F.4th 1331, 1339–40 (11th Cir. 2024).

Here, Radford's sentencing memorandum stated in clear terms that, after applying a 12-level increase for the loss amount under § 2B1.1(b)(1)(G) to her base offense level of seven, a "total offense level based on the loss is a level nineteen (19) and is appropriate and not disputed." Doc. 116 at 3. Moreover, Radford never challenged the loss amount in the PSR or at the sentencing hearing. This express representation is sufficient to induce or invite the district court to rely on the undisputed offense level and therefore precludes Radford from asserting such error on appeal. *See Boone*, 97 F.4th at 1240.

To the extent that Radford argues that her waiver was unintentional, she has not pointed to any cases in which we have required an explicit showing that the defendant intended to relinquish the right to appeal a particular issue before applying the invited error doctrine. Instead, we ask only whether the defendant's conduct induced or invited the error. *See, e.g.*, *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (defendant invited error in sentencing by acknowledging the possibility of the sentence in the plea agreement and colloquy); *United States v. Fulford*, 267 F.3d 1241, 1247 (11th Cir. 2001) (defendant invited error in jury instructions by agreeing with the court's proposed instruction); *United States v. Baker*, 432 F.3d 1189, 1216 (11th Cir. 2005) (defend-

ant invited error in admission of testimony by soliciting that testimony and then failing to object to it). Under this standard, Radford's affirmation that the loss amount was appropriate was sufficient to trigger the "cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *Love*, 449 F.3d at 1157. We therefore cannot say that the district court erred in applying the 12-level sentence enhancement under § 2B1.1(b)(1)(G).

### 2.  The District Court Did Not Plainly Err in Calculating the Restitution Amount.

Radford also challenges the district court's restitution calculation. Her arguments on this point are virtually identical to the ones that she raised in challenging the district court's loss amount calculation. But Radford did not object to the restitution calculation at sentencing. Challenges to restitution that are raised for the first time on appeal are reviewed for plain error. *Utsick*, 45 F.4th at 1332. "[A] sentencing court does not commit plain error by relying on factual findings contained in the PSR . . . when the defendant does not introduce evidence on the issue or object to the PSR's findings in that regard." *Hasson*, 333 F.3d at 1276. We therefore affirm the district court's restitution calculation.

### 3.  The District Court Did Not Err in Increasing Radford's Offense Level Under § 2B1.1(b)(12).

Radford also argues that the district court erred in applying a two-level sentencing enhancement under § 2B1.1(b)(12), which provides that a defendant receives a two-level enhancement "[i]f

the offense involved conduct described in 18 U.S.C. § 1040." The relevant portion of 18 U.S.C. § 1040(a) prohibits a person from:

> knowingly . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation, or mak[ing] or us[ing] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or representation, in any matter involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with . . . an emergency declaration under section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191).

Radford challenges the district court's application of the enhancement for three reasons. First, she argues that there was no fraudulent conduct because her certification on SSCC's SBA loan application did not contain a false statement. Second, she argues that her conduct was not done "in a matter involving" an emergency relief benefit because any fraud occurred only against a private entity and not a federal agency responsible for relief benefits. Third, she argues that applying the enhancement would be impermissible double counting because the enhancement does not address any harms that were not already accounted for by Radford's conviction. We divide our analysis into three parts corresponding to these arguments.

### a. There was a false statement.

Radford contends that, for the § 2B1.1(b)(12) enhancement to apply, her offense "must involve fraudulent conduct in a matter involving benefits that were authorized or paid in connection with a Stafford Act emergency or disaster declaration." Appellant's Br. 15–16. She argues that her certification on the SBA loan application that no one would be paid a consulting fee was not false because, as the government argued at trial, she was not authorized to receive a consulting fee. She further contends that the statements in the application were SSCC's, not hers, because Smith testified that he reviewed the loan application. We are not persuaded.

The amended loan agreement represented that "[n]o fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported [to the SBA]" and that "[a]ll fees not approved by SBA are prohibited." Doc. 97-126 at 5. The government introduced evidence that Radford steered the loan application process, signed the loan agreement documents in Smith's name, and then wrote herself a check for consulting fees on the day SSCC received the loan. From that evidence, the district court found that she prepared the loan application and arranged to receive a consulting fee for obtaining the loan. The court did not clearly err in making that finding.

Nor did the court err in applying the enhancement based on its finding that Radford signed the loan agreement knowing that she would receive a consulting fee. As an initial matter, the signed loan agreement says nothing about authorization—the signed agreement makes clear that no fee could be paid for preparing the agreement and that any fees not approved were prohibited. *See* Doc. 97-126 at 5. Her affirmation therefore is made false by the act of payment, even if, as she argues, Smith authorized the payment.

Even accepting that the loan agreement itself is SSCC's statement, § 1040 applies to "whoever" knowingly makes any false statement or "makes . . . any false writing" that contains a false statement. Regardless of whether the writing was made on SSCC's behalf, the district court made the factual finding that Radford made the writing and that the writing contained a false statement because she knew that she would issue herself a payment.

It makes no difference that Smith reviewed the loan agreement. Radford asserts that in "countless" cases defendants who allowed others to apply on their behalf and remained ignorant of the application's details have nonetheless been held liable for making false statements. Appellant's Br. 19. Maybe so. But that says nothing of the preparer's liability, and Radford cites no authority for the proposition that she cannot receive a sentence enhancement simply because Smith also may have been liable under § 1040.

The district court did not clearly err in finding that Radford signed the loan agreement knowing that she intended to pay herself a fee, nor did it err in applying an enhancement for knowingly making a fraudulent statement under § 1040.

### b. Radford's conduct involved § 1040.

Next, Radford argues that § 1040's phrase "in a matter involving" requires that the act "must have been done in furtherance of obtaining the benefit." Appellant's Br. 22–23 (emphasis omitted). She argues that her conduct did not satisfy this standard because her actions in applying for the SBA loan were not fraudulent, but rather the fraudulent action occurred after the fact and was against SSCC, not a government agency. She argues that her conduct, which consisted of issuing a check to herself from her employer, was too attenuated from the federal government's authorization, transportation, transmission, transfer, disbursement, or payment of the emergency benefit to qualify for the application of the § 2B1.1(b)(12) enhancement.

Radford's arguments on this point fail because we have already concluded that her conduct was prohibited by § 1040. Undoubtedly, her false statements made in the loan agreement were made "in a matter involving" a Stafford Act benefit because the very purpose of the agreement was to receive a Stafford Act benefit. We therefore conclude that the district court did not err by applying the § 2B1.1(b)(12) enhancement.

### c. Applying the enhancement is not double counting.

Finally, Radford argues in the alternative that the district court's application of the § 2B1.1(b)(12) enhancement was impermissible double counting, even if her actions qualified for application of the enhancement. Because Radford did not raise this argument before the district court, we review it for plain error only. *See McNair*, 605 F.3d at 1222.

Even assuming there was error here, the error was not plain. Radford concedes that "[n]o court has addressed whether the application of § 2B1.1(b)(12) constitutes impermissible double counting when one of the underlying convictions is a violation of 18 U.S.C. § 666(a)(1)(A)." Appellant's Br. 27. If the district court had committed an error, it could not be plain because the double-counting issue has not been specifically and directly resolved by this Court or the Supreme Court. *See Sanchez*, 940 F.3d at 537. We therefore affirm the district court's application of the § 2B1.1(b)(12) enhancement.

### 4. The District Court Did Not Err in Increasing Radford's Offense Level Under § 3B1.3.

Radford next contends that the district court clearly erred in finding that she abused a position of trust and thus erred in applying an enhancement under U.S.S.G. § 3B1.3. Radford reads our caselaw to require "something akin to a fiduciary function" for a person to qualify as occupying a position of trust. Reply Br. 31. She asserts that she did not have sufficient discretion in her office manager role to have occupied a position of trust with SSCC that

goes "beyond the ordinary reliance and confidence that an employer places in his employee." *Id.*

Under U.S.S.G. § 3B1.3, a defendant receives a two-level enhancement if she "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." We have observed that the "guidelines define 'positions of public or private trust' narrowly based on the professional discretion, if any, of the defendant." *United States v. Louis*, 559 F.3d 1220, 1225 (11th Cir. 2009). As a result, "[t]he determination of whether a defendant occupied a position of trust is extremely fact sensitive." *Id.* (citation modified). "For the enhancement to apply, [the] defendant must have been in a position of trust with respect to the *victim* of the crime, and the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense" because "such persons generally are viewed as more culpable." *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998) (citation modified).

In the fraud context, we have recognized § 3B1.3 applies "in two situations: (1) where the defendant steals from his employer, using his position in the company to facilitate the offense, and (2) where a fiduciary or personal trust relationship exists with other entities, and the defendant takes advantage of the relationship to perpetrate or conceal the offense." *Id.* at 837–38 (citation modified). We have treated these two situations differently.

In the "paradigmatic case" where, as here, the defendant uses her position in the company to facilitate stealing from her employer, we determine whether § 3B1.3 applies by looking not to the fiduciary nature of the relationship but to the level of discretion the employee enjoyed because of her employment. *See United States v. Linville*, 228 F.3d 1330, 1331 (11th Cir. 2000). Thus, in *Linville*, we upheld an application of a § 3B1.3 enhancement where the defendant "engaged in a scheme to use the signature authority conferred on him by his employer . . . to forge checks that were cashed and converted to personal use." *Id.* Similarly, in *United States v. Britt*, we determined that the enhancement was appropriate for a part-time employee in the Social Security Administration whose responsibilities included processing applications. 388 F.3d 1369, 1371–72 (11th Cir. 2004), *vacated on other grounds*, 546 U.S. 930 (2005), *reinstated in part*, 437 F.3d 1103 (11th Cir. 2006). We did so because she "was not closely supervised" and "had a great deal of discretion, including whether to accept, reject, or report for further investigation the documentary evidence submitted to her in support of applications." *Id.* at 1372.

We have required proof of a personal trust relationship only in cases involving fraud against non-employer entities. *See, e.g., United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (holding that impersonating corporate officials does not create a position of trust between defendant and company employees); *United States v. Hall*, 349 F.3d 1320, 1325 (11th Cir. 2003) (concluding that defendant's status as a pastor does not create a personal trust relationship with his congregation); *United States v. Mullens*, 65 F.3d

1560, 1567 (11th Cir. 1995) (ruling that membership in the same country club did not create a personal trust relationship with investors in a ponzi scheme). In these cases, we have warned that sentencing courts must "be careful not to be overly broad in imposing the enhancement" lest it apply to "every defendant who occupied any position of trust with anyone, victim or otherwise." *Garrison*, 133 F.3d at 837–38 (citation modified). To avoid that overbreadth, we have "distinguish[ed] between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." *Id.* at 838 (citation modified). But such concerns are not present where, as here, an employee commits fraud against her employer, because the victim's trust is based on the employee's position.

Radford was employed as SSCC's office manager, so we need only look to the level of discretion that she enjoyed in this position. By virtue of her position, Radford had access to SSCC's books and accounts, as well as the authority to sign checks on its behalf. She used this access to sign fraudulent checks from SSCC's account for her own personal use. And she attempted to conceal her theft by accessing Smith's e-mail. She therefore had at least as much discretion in her office manager position as the defendants in *Linville* and *Britt* did. Radford protests that Smith, her supervisor, still had to review and approve financial actions before she took them. But, as in *Britt*, Radford "was so loosely supervised" that she was able to carry out her fraud for months before it was

detected. *See Britt*, 437 F.3d at 1372. We therefore conclude that the district court did not clearly err in finding that Radford abused a position of trust, nor did it err in in determining that the § 3B1.3 enhancement applies.

## IV.    CONCLUSION

For the above reasons, we affirm the district court.

**AFFIRMED.**